677 So.2d 1013 (1996)
Gordon J. TRENTECOSTA
v.
Robert BECK, Ronnie Jones, Kermit Smith and the Louisiana Department of Public Safety and Corrections.
No. 95-CA-0096.
Court of Appeal of Louisiana, Fourth Circuit.
May 1, 1996.
Rehearing Denied August 29, 1996.
*1014 Richard A. Tonry, Michael C. Ginart, Jr., Kim C. Jones, The Law Offices of Tonry & Ginart, Chalmette, for Plaintiffs-Appellees Gordon J. Trentecosta and C & T Arabi, Inc.
Richard Ieyoub, Attorney General, Gregory G. D'Angelo, Special Assistant Attorney General, Panzeca & D'Angelo, Metairie, for Defendants-Appellants Robert Beck, Ronnie Jones, Kermit Smith and the State of Louisiana, Department of Public Safety and Corrections.
Before ARMSTRONG, WALTZER and LANDRIEU, JJ.
WALTZER, Judge.
The Department of Public Safety and Corrections for the State of Louisiana and individual state troopers Robert Beck, Ronnie Jones and Kermit Smith appeal a judgment against them in solido and in favor of plaintiff Gordon J. Trentecosta in the amount of $25,000.00 and plaintiff C & T Arabi, Inc. in the amount of $188,715.00. Additionally, plaintiffs appealed seeking to increase the amount of damages awarded.
The trial court provided the following written reasons for judgment:

*1015 Plaintiff, Gordon J. Trentecosta owned and operated the Chiffon Room where charitable organizations held bingo games. Defendants conducted an undercover investigation of plaintiff's business and thereafter caused a warrant to be executed for the arrest of plaintiff for violating Louisiana gaming laws.
Defendant Employees (sic) of the Louisiana Department of Public Safety and Corrections made statements concerning plaintiff which were printed in the Times Picayune. There they claimed plaintiff was conducting a large scale illegal bingo operation which bilked thousands of dollars from charities using the Chiffon Room.
This Court is of the opinion that defendants actions were defamatory and plaintiff is entitled to damages. The information and evidence obtained from defendants investigation did not support the information or statement released to the Times Picayune. Although plaintiff seems to have somewhat deviated from the rules for charitable gaming, this was done after checking with, and having his procedures cleared by the State Police. Additionally, the deviation regarding club rentals was to the benefit of the charities and resulted in a savings on rentals owed plaintiff's hall.
Defendants had and presented absolutely no evidence that plaintiff was running a large scale illegal operation or bilking his customers.
Having found that a defamatory communication was made it must next be decided whether the communication enjoyed a privilege. Normally a report on an investigation from law enforcement officials to the media would fall under a conditional or qualified privilege. In this instance, however, the Court finds that defendants acted in bad faith by reporting statements to the press that they knew or should have known were false. A privilege therefore does not exist as a defense to the defamation.
On the issue of damages, plaintiff presented evidence of his embarrassment, humiliation and mental suffering. Plaintiff further introduced evidence of the damage to his reputation and loss of income to his corporation C & T Arabi, Inc.
Plaintiffs are not entitled to damages for his claim of malicious prosecution. Louisiana law requires termination of the criminal prosecution in favor of the plaintiff as precursor to an action for malicious prosecution. While the criminal proceedings in St. Bernard have been dormant for sometime, they are still pending against plaintiff.
Defendant-appellants raise the following assignments of error:
1. The trial court erred in finding that the statements published in the Times Picayune were attributable to the defendants.
2. The trial court erred in finding that the statements published in the Times Picayune were defamatory.
3. The trial court erred in misapplying the law applicable to this case by placing the burden on defendant to prove absence of malice and truth of the statements.
4. The trial court erred in excluding evidence offered to show the defendants' state of mind.
5. The trial court erred in finding that the statements published in the Times Picayune were not subject to a privilege and that the defendants acted with malice.
6. The trial court erred in holding, "Although plaintiff seems to have somewhat deviated from the rules for charitable gaming, this was done after checking with, and having his procedures cleared by the State Police."
7. The trial court erred in awarding damages to plaintiff.
8. The trial court erred in not finding that the information given to the press by Smith and Jones was not true.
Plaintiff appealed raising one assignment of error:
1. The trial court clearly abused its discretion in the amount of damages awarded, which should be increased.

*1016 I. Assignment One

Defendant's first specification of error is the trial court erred in finding that the statements published in the Times Picayune were attributable to defendants.
The Times Picayune Article appeared on May 5, 1989 and read as follows:
ARABI BINGO HALL BUST NETS BOSS, WORKERS
The operator of an Arabi bingo hall and three of his employees were arrested Thursday morning and accused of violating state gaming laws after a four-month sting operation conducted by undercover State Police.
Troopers with the State Police Charitable Gaming Division posed as members of a fictional charity, the Vietnam Veterans Leadership Organization, and conducted bingo games at the hall for the past six weeks.
During those games, Gordon "Tiny" Trentecoasta (sic), operator of The Chiffon Room, 7616 W. Judge Perez Drive, allegedly told troopers they had to use hall employees as paid game workers and also based his hall rental on a percentage of the group's profits.
State charitable gaming laws require that game workers be volunteers and that hall rent be based on a set amount, not on a percentage of profits, said Sgt. Kermit Smith of the Charitable Gaming Division in Baton Rouge.
Ironically, Smith said Trentecoasta (sic) was violating the law when he lowered the rent after the group failed to make enough money to cover the $600 fee normally charged for one night's use of the hall.
"I was being generous and I'm being shafted," Trentecoasta(sic) said.
Smith said he wasn't certain if undercover troopers were ever made to pay more than the $600 session rent when the organization had a good night.
Trentecoasta (sic) said he never arranged for his employees to work for the fictional charity and that undercover troopers made those arrangements themselves.
Trentecoasta (sic) said he told undercover troopers that they would "get the first $300. In other words, if they didn't make $300 the rent was free."
He said on one occasion, the group made $357 and he charged $57 for the use of the hall. On another night, the club made $1,200 and he collected the full $600.
Troopers received complaints of the alleged violations from charitable groups using the hall. The hall was closed Thursday by State Police until the charges against Trentecoasta (sic) are adjudicated, said State Police spokesman Lt. Ronnie Jones.
"The organizations that ran games there were clean," Jones said.
Permit records show that those groups were the Hercules Carnival Club, the East Jefferson Basketball Club, Strutters Inc. and the Pandora Carnival Club.
Jones labeled the actions of Trentecoasta (sic) as a "large-scale illegal bingo operation." Smith said the operation bilked thousands of dollars from charities using the hall over the years.
Smith said the Chiffon Room employees were paid $35 each night they worked from bingo proceeds and would take money from a "donation jar," a jar where bingo pot winners would donate money back to the charity.
Trentecoasta (sic), 53, of Chalmette, was arraigned on charges of conspiring to violate charitable gaming laws and leasing his hall with payment based on a percentage of gross bingo profits. He appeared in 34th Judicial District Court Thursday where Judge David Gorbaty set a $3,600 bond.
Booked with illegally accepting compensation for working at bingo sessions were Susan Coombs, 41, of Violet; Loralee Henry, 55, of Meraux; and Hatti Guedimin, 57, of Meraux ...
Coombs also was booked with conspiracy to violate charitable gaming laws.
Smith said the State Police investigation is continuing and is not limited to The Chiffon Room.
In the sting operation, six troopers posed as members of the charity while they made a lease arrangement with Trentecoasta (sic), filed for proper permits and *1017 prepared to operate games. [Emphasis supplied].
The Times Picayune article was based on the following press release issued May 4, 1989 by Captain Ronnie Jones, then Supervisor of Public Affairs for the State Police:
Press Release
 May 4, 1989
 For Immediate Release
 For More Info: 925-1835

ST. BERNARD BINGO HALL SHUT DOWN IN STATE POLICE STING
State police culminated a four month long "sting" operation this morning with the arrest of a St. Bernard Parish bingo hall operator and 3 of his workers for illegal activities associated with the hall's management.
Responding to complaints from local charitable organizations, state troopers created the fictional charity in order to penetrate what was termed "a large scale illegal hall operation." The troopers actually ran bingo games in the Chiffon Room at 7617 West Judge Perez Drive in Arabi.
No allegations of improprieties have been made against the four other legitimate organizations which have rented space at the hall to conduct bingo sessions.
According to investigators, Gordon "Tiny" Trentecosta, the operator (sic) would make arrangements with the organizations (sic) conducting games at his facility to make payments to him according to the profits earned by the charitable organizations. He would also require that organizations conducting bingo sessions at his facility hire his employees to run the games.
Working with the local gaming authority and the Sheriff's office warrants were issued and executed this morning at the bingo hall. Arrested was Gordon "Tiny" Trentecosta, 54, of #6 Queens Court, Chalmette, the hall operator. He was charged with aiding, abetting and conspiring to violate the state's charitable gaming laws, and leasing premises with payment based on a percentage or portion of gross profits derived from a game of chance.
Also arrested were 3 of Trentecosta's workers, Susan Coombs, 41, of Violet, Loralee A. Henry, 55, of Meraux, and Hatti Guedimin, 57, no address available. All three were charged with illegally accepting compensation for working at bingo sessions for charitable organizations. Coombs was also charged with conspiracy to violate the the (sic) charitable gaming statutes.
We note that the Times-Picayunne had a right to rely upon the press release given to them by the State Police. When questioned about the quote "what was termed `a large scale illegal hall operation'" within his press release, Captain Jones testified that the quote came from one of the investigators, but he did not remember which one. The individual officers could have cross-claimed against each other and attempted to prove who made the statement, if they had wished. In the absence of such an adversarial approach, we cannot conclude that the trial court erred in attributing the quote to the defendants.

II. Assignment Two
Defendants argue that the trial court erred in finding the statements defamatory. At trial it was shown that Trentecosta and the Chiffon Room operation did not bilk its customers, nor had it bilked them of thousands of dollars over the years. Further Trentecosta did not operate "a large scale illegal bingo hall operation".
Trentecosta had built and operated the Chiffon Room as a bingo hall since 1964. He had applied for and had obtained all licenses required for the operation of his business, including licenses issued by the State Police. In addition to the Chiffon Room, Trentecosta also operated a very successful catering business. Trentecosta would provide the Chiffon Room in four hour time blocks to organizations for charitable gaming purposes, i.e. fundraisers for the organization. Theoretically, the organization would encourage its members and guests to attend and would provide volunteers, members or otherwise, to work at the event.
*1018 In reality, some events were not as well attended by members and guests as anticipated such that the charitable organization did not make enough money to pay the rent, much less a profit. To address this problem, Trentecosta began to develop an alternative. The rent for his hall would be $600 for 4 hours or approximately $150 an hour. He proposed to forgive the rent and allow the organization to use his hall for free if they made $300 or less. If they made over $300, his rent was $600, but he further would forgive a portion of the rent if the organization made less than $900. The schedule of rental payments made by the state police sting organization, the Vietnam Veterans Leadership Organization is illustrative. On April 6, 1989, the organization grossed $357 and paid $57 in rent. On March 30, 1989, the organization grossed over $1,200 and paid $600 in rent. On March 23, April 13, April 20, and April 27 the organization grossed under $300 and paid no rent for the use of the hall. Thus the organization's total use of the hall was 6 sessions at 4 hours each or 24 hours of use for a total rent charge of $657, averaging slightly less than $110 a session or approximately $27.50 an hour. Exhibit P-9 is the rental agreement between C & T Arabi and the Vietnam Veterans Leadership Association. It provided as follows:
C & T ARABI INC. AGREE TO RENT THE CHIFFON ROOM LOCATED AT 7617 W. JUDGE PEREZ DR, ARABI, LA TO THE CLUB NAMED BELOW: VIETNAM VETERANS LEADERSHIP ASSOCIATION FOR BINGO GAMES ON THE FOLLOWING DAY AND TIMES; THURSDAY DAYS, 10:00 AM 2:00 PM THE AGREED RENT TO BE $600 PER SESSION. RENT INCLUDES ALL UTILITIES, JANITORIAL SERVICE, ALL CARDS, BLOWER, LIGHTED BOARDS, CASH REGISTERS, ETC. NECESSARY TO OPERATE BINGO GAMES. IF NAMED EQUIPMENT SHOULD BREAK DOWN LESSEE WILL BEAR THE EXPENSE TO REPAIR OR REPLACE. THE EXPENSE WILL BE SHARED EQUALLY BY OTHER CLUBS RENTING THE CHIFFON ROOM. /S/GORDON J. TRENTECOSTA /S/VICTOR MONTALBANO[1]
Thus under the lease agreement the Vietnam Veterans Leadership Organization owed C & T Arabi $3,600 for 6 sessions and Trentecosta forgave all of it but for $657. This can hardly be said to be "bilking one's customers of thousands".
LSA-R.S. 33:4861.12(G) provides:
No lease providing for a rental arrangement of premises or equipment shall provide for payment in excess of the reasonable market rental rate for such premises or equipment and in no case shall any payment be based on a percentage of gross receipts or profits derived from a game of chance.

The Unabridged Edition of the Random House Dictionary of the English Language defines percentage as follows:
per*cent*age n. 1. Also called percent. a rate or proportion per hundred. 2. an allowance, duty, commission, or rate of interest on a hundred items. 3. a proportion in general: Only a small percentage of the class will graduate with honors. 4. Informal. gain; personal advantage. [PERCENT + -AGE]per*cent'aged, adj.

per*cent n. 1. Also called per centum. one one-hundredth part; 1/100. 2. percentage (def. 1). 3. Brit. stocks, bonds, etc., that bear an indicated rate of interest. adj. 4. reckoned on the basis of a rate of proportion per hundred (used in combination with a number in expressing rates of interest, proportions, etc.): to get three percent interest. Symbol % Also, per cent. [short for ML per centum for each hundred. See PER, CENT] per*cent'al, adj.

Usage. PERCENT is now found more often spelled as one word than as two, and the practice of considering CENT as an abbreviation for centum, hence written with a period after it, is becoming an archaism.
Thus it is apparent that a percentage is a mathematical ratio and a lease contemplated under the statute would be one providing *1019 "the rent is X% of the game receipts (or profits)." The Schedule of Rental Payments for the Vietnam Veterans Leadership Organization is as follows:

 Game Date Contract Rent Rent Paid Percentage
 1 3/23/89 $600 -0- 0%
 2 3/30/89 $600 $600 47%
 3 4/6/89 $600 $ 57 16%
 4 4/13/89 $600 -0- 0%
 5 4/20/89 $600 -0- 0%
 6 4/27/89 $600 -0- 0%

Just because the State Police figured out the ratio of the rent paid to the total receipts per game does not mean that the lease agreement was a percentage contract. In order to be a percentage contract the lease would have had to say that the rent was a fixed percent of the receipts such as "16% of the gross receipts of the game". Thus the State Police knew at the time that they requested the warrants that the lease was not a percentage contract in violation of the statute. Further in its press release the State Police hedged when it said "He was charged with ... leasing premises with payment based on a percentage or portion of gross profits derived from a game of chance." Neither the phrase "or portion" nor the word "portion" are part of the statute, but rather were a license of interpretation taken by the State Police. We agree with the trial court's holding that the lease was not a percentage contract in violation of the statute.
The greatest evidence of good faith on Trentecosta's part is the fact that he obtained approval of his novel rental approach from Sgt. Frank Brown, Assistant Director of the Charitable Gaming Division of the State Police before putting the rental approach into effect. The State argues that Brown approved a different rental arrangement than the one used by Trentecosta, however, we have nothing in the record to support this statement. Thus we find the statement that Trentecosta, who was fully licensed and who had operated both of his businesses within the law for almost 30 years, operated "a large scale illegal (bingo) hall operation" a clearly false and defamatory statement.
Just as some organization events were not as well attended as hoped, an organization sometimes could not get members or enough members to volunteer to work the events. In the instant case, "Vic Montalbano" asked Trentecosta if he knew of anyone willing to work the event. Trentecosta suggested that Montalbano go to the V.F.W. hall and some of the other bingo halls and ask people working those games. He mentioned that Susan Coombs worked at the V.F.W. hall. Trentecosta had no further discussion, input or contact with the employment. Susan Coombs, Hattie Guedimin and Loralee Henry were former employees, not only of the Chiffon Room, but of all the other bingo halls in the area as well. St. Bernard is a small parish and the pool of individuals knowledgeable in working bingo games is likewise small. The women did "shift work" at all of the various bingo halls. These workers were paid $35 for a 4 hour shift or slightly less than $9 an hour. "Vic Montalbano" paid the workers. Neither Trentecosta nor C & T Arabi, Inc. paid the workers. Vic made payment from a "donation jar" of money donated to the charity. With payments to workers of less than $9 an hour to three workers made not by Trentecosta, but by "Vic Montalbano" and room rentals of $27.50 an hour, it cannot be factually correct to say that Trentecosta or his company "bilked customers" much less for thousands of dollars.
Although the press release stated that the state police had received complaints from charitable organizations, at trial it was revealed that they had received one anonymous phone call[2]. Indeed, it is highly unlikely that the charitable organizations would complain about someone letting them use a hall for free. This is especially true in light of the fact that there were other bingo halls in St. Bernard, thus the organizations could have just brought their business somewhere else. Indeed, it is much more likely that one of Mr. Trentecosta's competitors would not like him providing his hall for free.
*1020 We cannot conclude that the trial court erred in concluding that the statements were defamatory.

III. Assignment Three
The trial court did not err by misapplying the law applicable to this case by placing the burden on defendant to prove absence of malice and truth of the statements. The trial court judge did not require the defendants to prove absence of malice, rather he found that the defendants knew that plaintiff was not operating a large scale illegal bingo operation nor had the plaintiff bilked customers out of thousands when they made those statements to the press, thus he found actual malice on the part of the defendant's when they made the statements. The trial court judge states in his reasons: "the Court finds that defendants acted in bad faith by reporting statement (sic) to the press that they knew or should have known were false." Having found both false statements and having malice on the part of the defendants, the defendants' defense thereto would have been truth or no malice. The burden of proof complained of by the defendants was not a burden of proof, but a burden of their defense.
We have independently reviewed the surveillance tapes in this matter not once but twice. It is absurdly clear that the State Police did not have a scintilla of evidence[3] against Gordon Trentecosta when they requested the warrant. We note that originally the district court judge refused to issue a warrant on the basis of the State Police's tapes. It was only after the State Police moved to recuse the district court judge and made personal accusations against the judge, that the warrant was issued. The warrant does not stand because at the time that the warrant was issued, the State Police knew that the tapes did not support the warrant. We note that the criminal prosecution under that warrant was never pursued by the district attorneys office and has probably prescribed due to prosecutorial abandonment based on failure to prosecute within one year. This assignment is without merit.

IV. Assignment Four
The defendant's fourth assignment of error is that the trial court erred in excluding evidence offered to show the defendants' state of mind, specifically the warrant, the case report of Trooper Beck proffered as State's Proffer 5, and the motives of Captain Jones and Trooper Smith. The warrants were admitted as P-3 and P-4 and Captain Jones and Trooper Smith both testified. We have reviewed Proffer 5 and find that it does not persuade this court that an error has occurred. This assignment is without merit.

V. Assignment Five
Defendants argue the trial court erred in finding that the statements published in the Times Picayune were not subject to a privilege and that the defendants acted with malice. As to the question of malice, we refer to our discussion above wherein we held that the trial court did not err in finding actual malice. On the issue of privilege, defendants cite the case of Toomer v. Breaux, 146 So.2d 723 (La.App. 3 Cir.1962), stating:
In other more numerous instances, a publication enjoys a (qualified) or conditional privilege, if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating *1021 has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty.
As previously discussed, defendants fail to meet part a of the test. Although the troopers were communicating on a subject matter in reference to which they have the duty of enforcement of charitable gaming laws, the communication was not made to a person "having a corresponding ... duty to enforce charitable gaming laws. The qualified privilege was obviously meant to apply in instances of two law enforcement officers working on a case. Here the communication was not made to another law enforcement official, but rather to the general public at large. Defendants in the instant matter fail two of the three parts of the test for a qualified privilege. This assignment is without merit.

VI. Assignment Six
Defendants argue the trial court erred in holding, "Although plaintiff seems to have somewhat deviated from the rules for charitable gaming, this was done after checking with, and having his procedures cleared by the State Police." The trial court judge found the testimony that Trentecosta cleared his rental arrangement with Sgt. Frank Brown credible. On appeal, findings of fact by the trial court are only reviewable within the parameters of the "manifest error" rule. The Court of Appeal may not set aside a trial court's finding of fact in the absence of "manifest error". Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) on remand 370 So.2d 1262 (La.App. 3 Cir.1979) writ denied 374 So.2d 660 (La.1979); Rosell v. ESCO, 549 So.2d 840 (La.1989) on remand 558 So.2d 1360 (La.App. 4 Cir.1990) writ denied 561 So.2d 105 (La.1990). Based upon the record before us, we cannot conclude that the trial court was manifestly erroneous in its factual determinations. This assignment is without merit.
VII. Assignment Seven
Defendants argue the trial court erred in awarding damages to plaintiff. The trial court heard the testimony of two experts, Dr. Mel Wolfson for the plaintiff and Dr. Kenneth Boudreaux for the defendants.
Dr. Wolfson established a cash flow projection to derive loss of earnings as follows:

 1985 162,439
 1986 76,364
 1987 47,810
 1988 182,810
 1989 92,167 (Article published 5/5/89)
 1990 75,449
 1991 23,204
 1992 3,555

Thus the Trentecosta 1989 income was half of the 1988 income. State's Exhibit No. 2 (Attached hereto as "Addendum 1") prepared by Dr. Boudreaux and entitled "Bingo Rental Revenues St. Bernard Parish" indicates a large jump in income from 1988 to 1989. Thus if Trentecosta's income had followed the parish average, his income would have increased to well over his 1988 level, not decreased by half.
Defendants argue that the decrease in plaintiff's cash flow was not the consequence of the defamatory statements, but rather the result of downturns in the entire St. Bernard Parish bingo industry resulting from increased competition from other forms of gambling. Once again, the State's own Exhibit No. 2 contradicts this statement, because it shows that while there was a dip in 1990 to 1988 levels, the bingo industry in St. Bernard had revenues higher in 1991 and 1992, when more competition was operating, than in any other years.
In support of its contention that the lost business was due to increased competition instead of the arrest and article, the defense introduced the following:
1. An Affidavit by the Deputy Director of the Mississippi Gaming Commission indicating that 5 casinos opened in Biloxi from May to October, 1992 and 1 opened in 1993.
2. Letter and supporting documents from Director of the Louisiana State Police Video Gaming Division indicating that 51 video poker machines were installed at the Finish Line Off Track Betting Parlor in Arabi (at the location of the former Arabi Teletrack Off Track Betting Parlor) on July 23, 1992.

*1022 3. A letter from the General Counsel of the Louisiana Lottery indicating that the on-line Lotto game commenced operation on January 22, 1992 and the instant scratch off tickets commenced on September 6, 1991.
4. Letter and supporting documents from Assistant Executive Director of the Louisiana State Racing Commission to the Charitable Gaming Commission of the State Police indicating that the Arabi Teletrack Off-Track Wagering Facility opened on February 3, 1989.
Turning to the first exhibit, we note that the article was published and income began to decline in 1989, but the Biloxi casinos were not opened until 1992 and 1993. Thus, it is obvious that there is no correlation as to dates. Secondly, this "proof" makes two unproven assumptions: (1) that bingo players "cross-over" in their gambling habits to different types of games, (Perhaps some do and perhaps some don't, but those breakdowns by number of players and type of cross-over game would have to be established on the record.) and (2) the unproven assumption that Arabi and Biloxi are the same market area. While there are some individuals who drive to the casinos in Biloxi, the State Police should have introduced economic and market share evidence on what percentage of bingo players, who play at what frequency and at what dollar rate per head go to the Biloxi casinos at what frequency levels and play at what dollar rate per head, increasing cross-overs and revenue declines and increases.
Turning to the second exhibit, the 51 video poker machines started operation in 1992, three and half years after the beginning of the decline of the Chiffon room income in 1989. The 51 video poker machines are irrelevant to this inquiry.
Turning to the third exhibit, once again the lottery games did not even begin operation until two years after the beginning of the income decline and are thus irrelevant.
Turning to the fourth exhibit, the Off Track Betting Facility opened on February 3, 1989 and the arrest and articles occurred on May 5, 1989, thus the off track betting parlor was operational for 3 months before the article appeared. The 1988 revenues were $182,810 and the 1989 revenues of $92,167 or approximately half of the 1988 revenues, were earned primarily in the bingo hall's first five months of operation. As of May 5, 1989, approximately one month short of mid-year, the 1988 earnings were slightly more than half the earnings of the previous year. In other words, the 1989 revenues were what one would have predicted for that year based on the 1988 revenues assuming no major changes in the market place or the individual operation. If the off-track betting facility was going to have a negative impact on the 1988 revenues, it would have shown up in the first half of the year revenues. The fact that the 1988 earnings at a month short of midyear were slightly more than half the revenues of the previous year indicates that there was no decline in bingo income in February, March and April of 1988 when the off track betting facility opened and was in operation. Thus the off track betting facility had no negative impact on the plaintiff's bingo revenues. As a practical matter, we all know of elderly ladies who see nothing wrong with playing bingo at church or after Wednesday night dinners at the Country Club or at a bingo hall for their sons or daughters or grandchildren's organization, but who would not be caught dead in an off track betting parlor, a racetrack, or a barroom playing video poker on the grounds that those places are unladylike. Showing that a small percentage of bingo players fall into that category was an element of proof necessary to support the State Police's argument and they simply did not prove it.
We further note that while parish wide bingo revenue experienced a slight drop from 1989 to 1990, parish wide bingo revenues actually increased to its highest levels in 1990-1991 and still remained higher than previous years other than 90-91 in 1991-1992. Thus the State's own exhibit shows not that parish wide bingo revenue declined as competition increased, but that parish wide bingo revenue increased as competition increased.
Lastly we note that State Exhibit No. 2 indicates that Trentecosta's market share of *1023 the parish wide bingo revenues was approximately 30% of the market prior to the article and arrest. The Chiffon Room had a large market share making it a natural target for anyone wanting to expand their own market share in the parish wide bingo market.
In its post-argument brief, the State Police argue that Trentecosta charged well over the average rent per session (presumably of the other bingo halls). Rent price was not regulated by the statute. For Trentecosta and all of the other bingo halls to agree to charge the same rent would itself be a crimethe anti-trust violation of price-fixing.
As discussed above, the trial court judge found the testimony of Dr. Wolfson more credible in examining the decline of income and eventual loss of The Chiffon Room. In light of the record, we cannot conclude that the trial court was manifestly erroneous in its factual determinations. Rosell, supra.

VIII. Assignment Eight
Lastly, defendants argue that the trial court erred in not finding that the information given to the press by Smith and Jones was not true. This assignment is repetitive and was previously discussed in assignments one and two. Accordingly, this assignment of error is without merit.

IX. Assignment Nine
At oral argument it was suggested that Kermit Smith was not an employee of the Louisiana State Police, but rather was an employee of a separate and distinct public relations firm hired as an independent contractor to the State Police. Not only do we find nothing in the record to support this contention, but all of the evidence in the record indicates the opposite.
Kermit Smith testified as follows:
"I'm employed with the Louisiana State Police, currently assigned to Troop A. (Employed) since 1981. (In the Charitable Gaming Division) from the inception in 1986 until about 1988 ... I did (receive a complaint about the Chiffon Room) ... It was an anonymous phone call we received in Baton Rouge. The person didn't want to identify themself(sic) and basically, advised us that we needed to examine the going-ons in St. Bernard, and in particular, Mr. Trentecosta's place.
Plaintiffs petition stated at Paragraph 3:
That the defendant, Kermit Smith, is a person of the full age of majority and is believed to be a resident of the Parish of East Baton Rouge, State of Louisiana, who, at all times material hereto, was employed by the State of Louisiana, Department of Public Safety and Corrections, as a commissioned State Trooper.
Officers Robert Beck, Ronnie Jones and Kermit Smith filed a joint answer which responded to the above quoted paragraph 3 with the statement "Paragraph 3 is admitted." Officers Beck, Jones, and Smith were jointly represented by the same attorney from the Attorney General's Office. At no time did his attorney attempt to treat the officers differently by, for example, filing cross-claims against or raising defenses against each other. If Kermit Smith felt that he was in a different situation than the other officers, then he should have requested separate representation from the Attorney General's Office.
We note that at various places in the record Kermit Smith is described as Sergent Kermit Smith. In addition to the admission in his answer and his testimony, Kermit Smith also executed the following affidavit which he filed into the record:

AFFIDAVIT
PARISH OF JEFFERSON
STATE OF LOUISIANA
1. I had knowledge of the complaints and undercover investigation of Gordon Trentecosta and his bingo hall prior to any press release.
2. I had knowledge of the undercover investigation prior to the arrest of Gordon Trentecosta.
3. I had knowledge of the execution of an arrest warrant for Gordon Trentecosta.
4. Based upon the information I was privy to, I had an honest belief Gordon Trentecosta was in fact violating the charitable gaming laws.

*1024 5. I was aware that Judge McBride signed the arrest warrant finding probable cause for the arrest of Gordon Trentecosta.
 /s/ Kermit W. Smith Jr.
 Sworn to and Subscribed before me, Notary
 Public, this 22nd day of Nov., 1993.
 /s/ illegible Notary Public
If, for example, Officer Smith had wanted to argue that he only accepted a routine phone call, passed on the information to his supervisor and had nothing further to do with the investigation, then he should have raised this or any other defense on the record. No separate defenses were raised on Kermit Smith's behalf and there is no basis in the record to treat Officer Smith differently from the other officers.

IX. Post-Argument Brief
In its post-argument brief the State Police argue that because the St. Bernard District Attorneys office charged Trentecosta a month after Frank Brown told the D.A.'s office that he had approved the rental arrangement, the charge by the St. Bernard Parish D.A.'s office is independent corroborative evidence that the State Police's charges were valid. As stated in their brief, the State Police gave the St. Bernard Parish D.A.'s office their Case Agent Report. The D.A.'s office relied upon the representations made to it in the Case Agent Report, which representations were false. We note that an indictment is not a conviction and that the D.A.'s office has not taken any steps in furtherance of prosecution. We further note that Mr. Trentecosta has not been convicted of anything.

X. Plaintiff's Assignment One
Plaintiff argues that the amount of damages awarded is insufficient and should be increased. The trial court awarded total losses of $213,715.00, $25,000.00 to Gordon Trentecosta and $188,715.00 to C & T Arabi, Inc. Under Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert denied (1994), 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379, we must look to this particular plaintiff in these particular circumstances in order to conclude if the trial court clearly abused its discretion in the amount of damages awarded. In the instant case, we conclude that the trial court did not err in failing to award the total amount of special damages claimed by plaintiff. Apparently, the trial court found those figures somewhat inflated and relied upon defendants' expert's calculations instead of plaintiff's expert's calculations. We cannot conclude that the trial court clearly abused its discretion in the amount of damages awarded.
Plaintiff also seeks damages for unlawful arrest, illegal seizures, lack of due process, punitive damages and attorneys fees. Plaintiff was arrested and the seizures were made pursuant to a valid warrant. We agree with the trial court's conclusion that the arrest was not unlawful. We cannot award attorneys fees or punitive damages unless authorized by statute and plaintiff has given us no statutory basis for such an award.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
LANDRIEU, J., dissents.
*1025 
*1026 LANDRIEU, Judge, dissenting.
Based on a evidence derived from a state police undercover "sting" operation, Gordon J. (a/k/a "Tiny") Trentecosta was arrested on May 4, 1989, and charged with violating state charitable gaming laws. That same day, the state police issued a press release pertaining to the arrest and charges. The next day an article appeared in the New Orleans Times-Picayune relating the arrest of Trentecosta for violating laws forbidding the compensation of bingo workers and basing rent on a percentage of the profit. Noting the irony that Trentecosta violated the law by lowering the rent below the set amount, the newspaper article quoted his statement that "I was being generous and I'm being shafted." Farther down in the article (in paragraph # 14), however, the article quoted the press release statement pertaining to a "large-scale illegal bingo operation," as well as a statement by a state police officer in the charitable gaming division that the "operation bilked thousands of dollars from charities using the hall over the years." Based on these statements, Trentecosta filed a civil action for defamation and malicious prosecution. While the criminal charges in this matter were pending, the civil case was tried in district court, resulting in the judgment now before us on appeal.
Because of the constitutional implications in defamation actions, this Court's scope of review on appeal is broadened significantly "to examine in depth, the statements in issue and the circumstances under which they were made and to re-examine the evidentiary basis of the lower court decision in the light of the Constitution." Mashburn v. Collin, 355 So.2d 879, 886-87 (La.1977) (citations and internal quotations omitted). Such a review of the record in this case reveals serious defects in the trial court's judgment.
First, where the defamation of character alleged consists of public statements that the plaintiff is guilty of the crime for which he was arrested, the defamation is merged with the prosecution, and, if the prosecution is not actionable, neither is the defamation. See Motichek v. Clovis-Hendry, Inc., 280 So.2d 225, 228 (La.App. 1st Cir.1968), writ denied, 282 So.2d 522 (La.1973) and jurisprudence cited therein. In this case, the trial judge noted in his reasons for judgment that he could not rule on the malicious prosecution claim because the criminal proceedings were still pending. Clearly, if the criminal prosecution was pending, a defamation action based upon that prosecution was premature.
In addition, judgment was rendered against individual state troopers, as well as Department of Public Safety and Corrections for the State of Louisiana, based upon the trial judge's finding that the communication did not fall under the conditional or qualified privilege normally accorded officers in this situation because the "defendants acted in bad faith by reporting statements to the press that they knew or should have known were false." The imposition of liability based on the trial court's determination of what the officers "knew or should have known" is clearly wrong.
Liability may not be imposed on public entities or their officers based upon the exercise/performance or omission of discretionary acts when such acts are within the course and scope of their lawful powers and duties unless such acts or omissions are (1) not reasonably related to the legitimate governmental objective for which the discretionary power exists or (2) "constitute criminal fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La.Rev.Stat. 9:2798.1 (West Supp.1996).[1]
The division of charitable gaming control in the office of the state police of the Department of Public Safety and Corrections was created to issue licenses and monitor the conduct of the licensees to the extent necessary to ensure compliance with the provisions of charitable gaming laws. (La.Rev.Stat. Ann. 40:85.4, 6 (West 1992). The Department has a duty to inform the public and explain its actions. Thus, the officers's actions *1027 were reasonably related to the legitimate objectives of their office.
The regulations governing charitable gaming at the time of the investigation specifically stated that (1) only active members of the authorized non-profit organization could assist in conducting the game; (2) no one could be compensated in any manner their role in conducting the game; and (3) "in no case shall any payment [for rental of premises] be based on a percentage of gross receipts or profits derived from a game of chance." La. Rev.Stat.Ann. 33:4861.12 (West 1988).
Sergeant Kermit Smith testified that the investigation into the plaintiff's activities was instigated by an anonymous phone call suggesting that "we needed to examine the going-ons in St. Bernard, and in particular, Mr. Trentecosta's place [the Chiffon Room]" because of the "involvement of either family and/or Mr. Trentecosta in the [bingo] games." Robert Beck, the undercover officer in the investigation, testified that whereas the average hall rental for charitable bingo games was approximately $400, the plaintiff rented his hall for $600 with the understanding that the first $300 went to the club and any profit above $300 would go to the plaintiff up to his rent of $600. Lieutenant Ronnie Jones, the state police spokesman, released the official press statement pertaining to the investigation and arrest of the plaintiff.
Notably, none of the officers knew the plaintiff or had any perceptible reason to single him out for an investigation and there is nothing to indicate that this investigation was carried out in an irregular manner. The investigating officer clearly believed he had a actionable case against the plaintiff, as did his superior officers and those responsible for instituting the criminal prosecution of the plaintiff. Moreover, as acknowledged by the majority opinion, the amount of rent paid to the plaintiff was derived from the actual game profits and the plaintiff's employees were paid workers at the bingo games.
As for Officer Jones, the state police spokesperson, there is nothing in the record which suggests that he had any reason to suspect the accuracy of the prepared press release. The press release apparently was an ordinary report given in accordance with an established procedure to apprise the public of state police activities and the results of state police investigations. Further, the plaintiff's hall was a public facility actively seeking commercial patronage and, as such, the investigation and arrest of the plaintiff was a matter of public interest. See Mashburn, 355 So.2d at 889.
There is no suggestion that the officers, all members of the charitable games control division, were reckless or motivated by malice or ill will in conducting the investigation and charging the plaintiff. The filing of criminal charges is an event subject to the press and public scrutiny. It was reasonable and necessary for the Department to explain to the public the basis of the charges filed against the plaintiff. Although the labelling of the plaintiff's operation as "large-scale" is subjective and may be hyperbole, the plaintiff certainly appears to have operated in an illegal manner and it is unclear to what extent he profited from his manner of operation at the expense of charitable organizations. Certainly, the filing of criminal charges and the pending criminal prosecution indicate that the officers were not without reasonable grounds for believing the issued statement to be true.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] The name "Victor Montalbano" is the alias used by the undercover officers signing the lease.
[2] Contained in the record are complaint letters by two charitable organization, but the complaint letters are dated after the sting operation had occurred. They are clearly after the fact. We further note that Susan Coombs was a member of Pandora and worked those bingo games as well.
[3] The tapes are primarily conversations between and among the two elderly women, ages 55 and 57, working at the bingo games.

At one point one of the women is upset because she is out of balance $29 because she was missing a pack of cherry bells. The women concluded that either it was dropped while circulating among the bingo players and selling the cherry bells or someone took it from the bucket. (One of the individuals circulating and selling the cherry bells was undercover officer "Vic Montalbano" a/k/a Officer Robert Beck.)
Another time, "Vic" suggests that the Chiffon Room employees illegally disconnect the power lines to a rival bingo hall in order to increase patronage at the Chiffon Room; no one pays any attention to "Vic" and his idea is politely ignored.
The State Police argued that Mr. Trentecosta "interfered" with the running of the games. In fact, one of the ladies told "Vic Montalbano" that when he was calling out the bingo ball numbers he could not "joke" with the players by pretending to hide balls, palm balls, not read out the numbers, etc. because the players would get angry. They told "Vic" to stop it.
[1] Similarly, in the criminal defamation context (which, although not definitive of civil liability, may be used as a guideline, see Gugliuzza v. K.C.M.C., Inc. 606 So.2d 790, 793 (La.1992) (citation omitted)), a qualified privilege exists and actual malice must be proved regardless of the veracity of the alleged defamatory statement when it is a fair and true report of any judicial or official proceedings.