703 So.2d 552 (1997)
Gordon J. TRENTECOSTA
v.
Robert BECK, Ronnie Jones, Kermit Smith and The State of Louisiana, Department of Public Safety & Corrections, et al.
No. 96-C-2388.
Supreme Court of Louisiana.
October 21, 1997.
Rehearing Denied December 19, 1997.
*554 Richard P. Ieyoub, Attorney General, Gregory G. D'Angelo, Metairie, for Applicant.
Richard A. Tonry, Michael C. Ginart, Jr., Tonry & Ginart, Chalmette, for Respondent.
Larry M. Roedel, John D. Koch, David A. Woolridge, Jr., Baton Rouge, for Louisiana Press Association, amicus curiae.
LEMMON, Justice.
This is a defamation action brought by Gordon Trentecosta and his business corporation. The allegedly defamatory statements were made by Louisiana State Police officers to the press shortly after Trentecosta was arrested for violating La.Rev.Stat. 33:4861.1.21, the Charitable Raffles, Bingo and Keno Licensing Law. The principal issues which prompted our granting certiorari are whether a law enforcement officer is entitled to a qualified privilege when the officer releases information to the public regarding an investigation and an arrest, and, if so, whether the officers abused the privilege in this case.

Facts
Since 1964, Trentecosta has operated the Chiffon Room in St. Bernard Parish as a bingo hall. Trentecosta leased the hall to charitable organizations for the rental price of $600 for a four-hour event. Because this rental price was higher than that charged by other rental halls in the area, Trentecosta instituted an alternative rental plan under which the charitable organization took the first $300 in receipts and paid as rent only the amount of receipts in excess of $300, with a maximum payment of $600.[1]
Concerned that this plan might conflict with the statutory prohibition against basing rent on a percentage of profits, Trentecosta obtained approval of the plan from the assistant director of the State Police Charitable Gaming Division prior to implementing it.
Subsequently, the State Police, based on an anonymous tip and on periodic reports filed by charitable organizations which *555 showed a higher ratio of expenses to profits for games at the Chiffon Room, commenced an undercover investigation of Trentecosta's bingo hall operation. As part of that investigation, the State Police formed a fictitious charitable organization, called the Vietnam Veterans Association, and undercover agent Robert Beck, using the name "Victor Montalbano," posed as the leader of that organization. Acting out that role, "Montalbano" rented the Chiffon Room for the organization to conduct bingo games. "Montalbano" signed a rental agreement that provided for the base rent of $600, but orally agreed with Trentecosta that the alternative rental plan would be used. "Montalbano" also obtained the necessary licenses from the state and parish to conduct charitable games at the Chiffon Room.
The licensing law at the time prohibited charitable organizations from paying workers who assisted in the bingo games. Professing not to know anything about operating bingo games, "Montalbano" inquired of Trentecosta about operating the game when a sufficient number of volunteers from the membership was not available. Trentecosta suggested that "Montalbano" consult veterans organizations who operated games at other halls, specifically mentioning Susan Coombs' name. "Montalbano" hired three of Trentecosta's former employees, including Susan Coombs, to work at the Vietnam Veterans' events.
During March and April 1989, the Vietnam Veterans Association ran six bingo games. Under the written lease, the rent payable would have been $3,600; however, pursuant to the oral alternative rental agreement, the organization paid Trentecosta's corporation, C & T Arabi, Inc, a total rent of only $657, since four of the games produced less than $300, one produced $357, and one produced $1,200.
"Montalbano" paid each of the three workers approximately $35 per session from a "donation jar," which contained money donated to the charity by winners at the games. Neither Trentecosta nor C & T Arabi hired these workers to assist at these games nor paid them for working at the events.
Based on the foregoing facts, the State Police obtained two arrest warrants against Trentecosta, one for violating La.Rev.Stat. 33:4861.12 G[2] by leasing the hall for a rental rate based on a percent of the gross profits derived from a game of chance, and the second for violating La.Rev.Stat. 33:4861.16 B[3] by conspiring to cause another person to violate state gaming laws by paying workers to run bingo games for charitable organizations.[4] On the day the warrants were issued, Captain Ronnie Jones, then Supervisor of Public Affairs for the State Police, issued the following press release:
Press Release
 May 4, 1989
 For Immediate Release
 For More Info: 925-1835
 ST. BERNARD BINGO HALL
 SHUT DOWN IN STATE
 POLICE STING
State police culminated a four month long "sting" operation this morning with the arrest of a St. Bernard Parish bingo hall operator and 3 of his workers for *556 illegal activities associated with the hall's management.

Responding to complaints from local charitable organizations, state troopers created the fictional charity in order to penetrate what was termed "a large scale illegal hall operation." The troopers actually ran bingo games in the Chiffon Room at 7617 West Judge Perez Drive in Arabi.
No allegations of improprieties have been made against the four other legitimate organizations which have rented space at the hall to conduct bingo sessions.
According to investigators, Gordon "Tiny" Trentecosta, the operator would make arrangements with the organizations conducting games at his facility to make payments to him according to the profits earned by the charitable organizations. He would also require that organizations conducting bingo sessions at his facility hire his employees to run the games.

Working with the local gaming authority and the Sheriff's office warrants were issued and executed this morning at the bingo hall. Arrested were Gordon "Tiny" Trentecosta, 54, of # 6 Queens Court, Chalmette, the hall operator. He was charged with aiding, abetting and conspiring to violate the state's charitable gaming laws, and leasing premises with payment based on a percentage or portion of gross profits derived from a game of chance.
Also arrested were 3 of Trentecosta's workers, Susan Coombs, 41, of Violet, Loralee A. Henry, 55, of Meraux, and Hatti Guedimin, 57, no address available. All three were charged with illegally accepting compensation for working at bingo sessions for charitable organizations. Coombs was also charged with conspiracy to violate the charitable gaming statutes. (emphasis added).
On the next day, the following article appeared in the Times Picayune newspaper:
ARABI BINGO HALL BUST NETS BOSS, WORKERS
The operator of an Arabi bingo hall and three of his employees were arrested Thursday morning and accused of violating state gaming laws after a four-month sting operation conducted by undercover State Police.
Troopers with the State Police Charitable Gaming Division posed as members of a fictional charity, the Vietnam Veterans Leadership Organization, and conducted bingo games at the hall for the past six weeks.
During those games, Gordon "Tiny" Trentecoasta, operator of The Chiffon Room, 7616 W. Judge Perez Drive, allegedly told troopers they had to use hall employees as paid game workers and also based his hall rental on a percentage of the group's profits.
State charitable gaming laws require that game workers be volunteers and that that hall rental be based on a set amount, not on a percentage of profits, said Sgt. Kermit Smith of the Charitable Gaming Division in Baton Rouge.
Ironically, Smith said Trentecoasta was violating the law when he lowered the rent after the group failed to make enough money to cover the $600 fee normally charged for one night's use of the hall.
"I was being generous and I'm being shafted," Trentecoasta said.
Smith said he wasn't certain if undercover troopers were ever made to pay more than the $600 session rent when the organization had a good night.
Trentecoasta said he never arranged for his employees to work for the fictional charity and that undercover troopers made those arrangements themselves.
Trentecoasta said he told undercover troopers that they would "get the first $300. In other words, if they didn't make $300 the rent was free."
He said on one occasion, the group made $357 and he charged $57 for the use of the hall. On another night, the club made $1,200 and he collected the full $600.
Troopers received complaints of the alleged violations from charitable groups using the hall. The hall was closed Thursday by State Police until the charges against Trentecosta are adjudicated, said State Police spokesman Lt. Ronnie Jones.

*557 "The organizations that ran games there were clean," Jones said.
Permit records show that those groups were the Hercules Carnival Club, the East Jefferson Basketball Club, Strutters Inc. and the Pandora Carnival Club.
Jones labeled the actions of Trentecoasta as a "large-scale illegal bingo operation." Smith said the operation bilked thousands of dollars from charities using the hall over the years.
Smith said The Chiffon Room employees were paid $35 each night they worked from bingo proceeds and would take money from a "donation jar," a jar where bingo pot winners would donate money back to the charity.
Trentecoasta, 53, of Chalmette, was arraigned on charges of conspiring to violate charitable gaming laws and leasing his hall with payment based on a percentage of gross bingo profits. He appeared in 34th Judicial District Court Thursday where Judge David Gorbaty set a $3,600 bond.
Booked with illegally accepting compensation for working at bingo sessions were Susan Coombs, 41, of Violet; Loralee Henry, 55, of Meraux; and Hatti Guedimin, 57, of Meraux....
Coombs also was booked with conspiracy to violate charitable gaming laws.
Smith said the State Police investigation is continuing and is not limited to The Chiffon Room.
In the sting operation, six troopers posed as members of the charity while they made a lease arrangement with Trentecoasta, filed for proper permits and prepared to operate games. (emphasis supplied).
While these criminal charges were still pending,[5] plaintiffs Trentecosta and C & T Arabi commenced the instant defamation action, naming as defendants three state troopers, Robert Beck, Ronnie Jones, and Kermit Smith, and their employer, the Department of Public Safety and Corrections.
After a trial on the merits, the trial court rendered judgment holding all four defendants solidarily liable for defamation and awarding general damages to Trentecosta in the amount of $25,000 for his embarrassment, humiliation, mental suffering and damage to his reputation, and to C & T Arabi, Inc. in the amount of $188,715 for the company's loss of income. In reasons for judgment, the trial court found that the troopers had defamed plaintiffs and that the results of the undercover investigation did not support the information they had released to the newspaper. The judge stated that the "[d]efendants ... produced no evidence that plaintiff was running a large scale illegal operation or bilking his customers." Further, the judge concluded that while law enforcement officers reporting on an investigation and arrest ordinarily would enjoy a conditional or qualified privilege, these "defendants acted in bad faith by reporting statements to the press that they knew or should have known were false" and were not entitled to a privilege.
The court of appeal affirmed, agreeing that the statements were defamatory and that the statements were not privileged, but reaching the latter conclusion on a different basis. 95-0096 (La.App. 4th Cir. 5/1/96); 677 So.2d 1013. Particularly, the intermediate court reasoned that the statements were not privileged because defendants did not meet the criteria for asserting a qualified privilege set forth in Toomer v. Breaux, 146 So.2d 723 (La.App. 3rd Cir.1962). Noting that the Toomer decision requires a communication made in good faith, on any subject matter in which the person communicating has an interest or in reference to which he has a duty, to a person having a corresponding interest or duty, the court concluded that the law enforcement officers were "communicating on a subject matter in reference to which they have the duty of enforcement of charitable gaming laws," but that the officers lacked good faith and that the communication was not made to a person with a corresponding duty to enforce charitable gaming laws. 95-0096 p. 13, 677 So.2d at 1021. Commenting *558 further, the court noted that the privilege "was obviously meant to apply in instances of two law enforcement officers working on a case." Id.
This court granted certiorari primarily to address the question of whether the law enforcement officers enjoyed a qualified privilege in reporting on an investigation and a resulting arrest, and whether they abused the privilege. 96-2388 (La.12/13/96); 692 So.2d 362.

Erroneous Attribution of Defamatory Statements to Defendants Collectively
We first address a preliminary problem raised by defendants regarding the trial court's attributing the defamatory statements collectively to all of them. Defendants first deny that the two allegedly defamatory statements (the statement attributed to Jones about the "large-scale illegal bingo operation" and the statement attributable to Smith about the "bilk[ing of] thousands of dollars from charities using the hall over the years") are attributable to any of them. Neither statement, defendants contend, was a direct quote from any defendant. Jones testified that the "large-scale illegal bingo operation" statement was made by an unknown party and then repeated to him by an investigating officer who, in turn, corroborated the "complaints" against Trentecosta through his undercover investigation. As to the "bilking" statement attributed to Smith, defendants submit that this was not a direct quote. Its source, according to defendants, apparently was from the complaint that prompted the investigation. Hence defendants argue that neither statement is properly attributable to any defendant. The court of appeal, defendants further argue, compounded this attribution error by holding that the "individual officers could have crossclaimed against each other and attempted to prove who made the statement, if they had wished," and that "[i]n the absence of such an adversarial approach, we cannot conclude that the trial court erred in attributing the quote to the defendants." 95-0096 p. 5; 677 So.2d at 1017.
Defendants' attribution argument really addresses the underlying legal issue glossed over by the lower courts in holding the individual defendants solidarily liable for the defamation claim. Defamation is an individual tort which, as a general rule, does not give rise to solidary liability. Ardoyno v. Ungar, 352 So.2d 320, 321 (La.App. 4th Cir. 1977),cert. denied, 354 So.2d 210 (La.1978). There are exceptions to the general rule, such as (1) when the statements are made pursuant to a conspiracy to defame, in which case all persons connected in the conspiracy are solidarily liable, and (2) when the defamatory statements are made by an employee in the course and scope of his or her employment, "at least when the defamation was authorized or ratified by the employer."[6]
Id.
As to the solidary liability of the three troopers, we disagree with the court of appeal that the officers, in order to avoid liability by association, should have crossclaimed against one another. Solidary liability among individuals for defamatory statements is contingent upon proof of a conspiracy among them to defame the plaintiff. Nowhere in the record was there any suggestion that the three officers conspired to defame plaintiffs. The officers' liability must be considered individually, rather than collectively as was done by the lower courts.
As to Officer Beck, there were no pleadings or proof that he made any of the statements. The trial court erred in holding Beck liable for defamation.
The liability of the other individuals, Officers Smith and Jones, must likewise be considered individually. While both dispute that they actually said the exact words printed in the article, the article closely tracks the press release as to the statement attributed to Jones, i.e., the "large-scale illegal bingo operation" statement. Given Jones' responsibility for issuing that press release, it cannot *559 be said that he did not make that statement.[7]
While attributing the "bilking" statement to Smith is more problematic because its source is more attenuated, Smith does not dispute that he repeated to the press the statement he received from another investigating officer. The fact that he was repeating to the press a statement he received from another officer may be relevant to his entitlement to a qualified privilege or to the imposition of a duty to investigate the accuracy of the statement. It is not relevant, however, for purposes of determining whether he made the statement. He did not deny making the "bilking" statement or the five other statements mentioned in the newspaper article with Smith as the source. Regardless of whether or not the statement was his personal creation, the publication of the "bilking" statement is clearly attributable to Smith individually.
Having concluded that the two statements were attributable to Jones and Smith respectively, we further conclude, based on our review of the record, that the statements were both made within the course of the two officers' employment duties and thus were attributable under vicarious liability principles to the Department.

Defamation
Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. Sassone v. Elder, 626 So.2d 345, 350 (La.1993)(citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111 (5th ed.1984)). Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Restatement (Second) of Torts § 558 (1977). Thus a plaintiff, in order to prevail in a defamation action, must prove "that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages." Sassone, 626 So.2d at 350.
A communication is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community or to deter others from associating or dealing with the person. Restatement (Second) of Torts § 559 cmt. e (1977). The lower courts concluded that two statements in the newspaper article were defamatory. Both the "large-scale illegal bingo operation" and the "bilk[ing] thousands of dollars from charities" statements contained elements of personal disgrace and undoubtedly satisfy the definition of a defamatory statement. The communications clearly were false. As the lower courts noted, there was absolutely no information uncovered in the investigation that Trentecosta operated a large-scale illegal bingo operation, that he required charitable organizations to hire his employees, or especially that his operation bilked thousands of dollars from charitable organizations using the hall over the years. Indeed, there was no evidence of "complaints of the alleged violations from charitable groups using the hall"; the record established only one complaint relating to Trentecosta, and that was from an anonymous source.
It is also undisputed that the defamatory statements were published by Officers Smith and Jones to third persons. Whether or not the publication was privileged is the issue which prompted our grant of certiorari. Moreover, the issue of the privilege claimed by Smith and Jones as law enforcement officers reporting the results of an investigation and an arrest is closely related to the question of fault, although fault is a separate element of the cause of action for defamation.

Fault
Prior to the decision in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the common law imposed strict liability for publishing a defamatory statement about a person that turned out to be false. Thus liability was imposed even if the publisher had exercised due care to check *560 the accuracy of the statement and reasonably believed it to be true. Restatement (Second) of Torts 258 (1977). The publisher could escape liability only by proving that the statement was true or by proving that the publisher under the circumstances enjoyed a privilege to make the statement and did not abuse the privilege. This qualified privilege was a defense based on the weighing of (1) the protection of the interest of the offended person against the harm done to his or her reputation, and (2) the protection of the interest of the public in receiving the information if it were true. Without the privilege, there was the danger that persons who should provide true information would not do so because of fear of a defamation action if the information ultimately turned out to be untrue.
In the Sullivan case, the Court ruled that the First Amendment prohibits a public official from recovering damages in a defamation action unless the official proves by clear and convincing evidence that the person publishing the offending statement did so with "actual malice"that is, the publisher had knowledge of the statement's falsity or made the statement with reckless disregard of whether it was false or not. The court reasoned, in an oft quoted pronouncement, that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Id. at 270, 84 S.Ct. at 721.
Thus the Court not only imposed the requirement of a high degree of fault in defamation actions brought by public officials, but also shifted the burden of proof of fault to the public official and imposed a heightened burden. This constitutional limitation was extended to "public figures" in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).[8]
In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that the federal constitution only requires the Sullivan actual malice standard in cases brought by public officials and public figures.[9] The Gertz decision left the standard in cases of defamation of a private individual in matters of public concern up to the states, as long as the state does not permit liability without fault. And in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Court held that the First Amendment requires placement on the plaintiff of the burden of proving falsity, as well as fault, in an action against a media defendant for matters of public concern.
This court has never addressed the requisite degree of fault for an actionable statement that injures a private individual in a matter of public concern,[10] deciding the Sassone case on the basis of defamatory meaning and not reaching that issue.[11] However, a significant measure of fault with regard to the falsity of the statement clearly is required. Restatement (Second) of Torts § 580B cmt. c (1977).
The plaintiffs in the present case are not public officials or public figures,[12] but the matter involved in the communicationa governmental investigation into the legality *561 of a local charitable gaming operationis a matter of public interest. This case therefore suggests the question of whether the Sullivan actual malice standard or some lesser degree of fault is applicable when a private individual is injured by a defamatory communication by a non-media defendant about a matter of public interest. However, we conclude it is not necessary to reach that issue because plaintiffs established the liability of one of the troopers even under the actual malice standard of reckless disregard.

Reckless Disregard under the Actual Malice Standard
In the Sullivan case, the Court defined actual malice in making a defamatory statement as a defamatory publication that was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-84 S.Ct. at 726. In the present case, there was no evidence that Smith and Jones knew their statements were false. Therefore, the actual malice standard required clear and convincing proof that the statements by Smith and Jones were made with reckless disregard for whether the statements were false or not.
"Reckless disregard" cannot be fully encompassed in one infallible definition. St. Amant v. Thompson, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The Court, however, has provided some guidance on the application of the "reckless disregard" standard.
In Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), a criminal defamation case, the district attorney of Orleans Parish made disparaging statements at a press conference, directed at the eight judges of the criminal district court, for which he was charged and convicted. Affirming the conviction, this court rejected the district attorney's constitutional challenge to the criminal defamation statute. Reversing, the Court reasoned that the same Sullivan "actual malice" standard extends not only to the civil but also to the criminal context and that the criminal defamation statute, to the extent it conflicts with that standard, is infirm. In so holding, the Court stated "only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times [v. Sullivan] may be the subject of either civil or criminal sanctions." Id. at 74, 85 S.Ct. at 216.
In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967),[13] the Court reiterated that recklessness requires a plaintiff "prove that the publication was deliberately falsified, or published despite the publisher's awareness of probable falsity." Id. at 153, 87 S.Ct. at 1991.
In St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), Thompson, a deputy sheriff, sued St. Amant, a senatorial candidate, for defamation based on statements St. Amant read on television about money "passing hands" between a labor union leader and Thompson. St. Amant quoted statements from the affidavit of a union member without knowledge of Thompson's activities or of the affiant's reputation for veracity, and without attempting to verify the information in the affidavit. The Court stated that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id. at 731, 88 S.Ct. at 1325. Noting that such a test may put a premium on ignorance, the Court further determined that the First Amendment requires such protection. However, the Court went on to observe:
The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that *562 only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

Id. at 732, 88 S.Ct. at 1326 (emphasis added).
The comments by the Supreme Court about the necessity of proving the publisher entertained serious doubts as to the truth of the publication in order to establish reckless disregard were made in cases involving a publisher who repeated defamatory statements obtained from an informant or some similar source. However, the "bilking" statement by Smith in the present case was not the repeating of a defamatory statement of an informant, at least as to Trentecosta's connection with the bilking.
As to the "bilking" statement, Smith went beyond the facts uncovered by the investigation. In his verbal statements to the press, he embroidered onto the underlying facts a sensational statement about Trentecosta that, on this record, was not based on information furnished to Smith by investigators, by an informant, or by anyone else, but was apparently created by Smith.
The focus of the fault inquiry in a defamation case based on actual malice is whether the publisher had a reasonable basis for believing that the statements were true. Here, Smith testified that he based his statement on information from Officer Beck that "some of the operators removed [money from the donation jar] and paid their workers, by the money donated back to the operation." Smith further admitted that Officer Beck never told him Trentecosta had anything to do with any organizations' payment of their workers with cash from the donation jar. Therefore, although Smith had a basis for believing that the charitable organizations using the Chiffon Room had illegally used a portion of their profits to pay workers at the games, Smith had no reasonable basis for believing that Trentecosta had bilked thousands of dollars over the years from those charitable organizations.
Smith's conduct appears to fit under the St. Amant decision's examples of bad faith publication of defamatory statements that would constitute "reckless disregard," namely, a story fabricated by the defendant or a product of the defendant's imagination. Here, Smith's attributing to Trentecosta any misuse of the charitable organizations' profits from the bingo games had no basis in reality. According to this record, Smith did not obtain this information from any source, reliable or otherwise. He apparently used information about misuse of funds and added his own suspicions to form a sensational connection with the target of the investigation. In making the statement that had no basis in fact or in information furnished to him from any source, Smith acted in bad faith and with reckless disregard as to whether the statements were false or not.
Accordingly, all of the elements of a defamation action have been proved against Smith and his employer.
The statement by Jones about the large-scale illegal bingo operation was more problematic. The police arrested Trentecosta and three of his former employees for illegal activities connected with bingo games in the Chiffon Room. While the information uncovered in the investigation may have been insufficient to convict Trentecosta and the other arrestees of criminal activity or to establish illegality in the operation of the games, Beck and others told Jones that the games were conducted illegally. Trentecosta produced insufficient evidence that Jones entertained serious doubts as to the truth of the statement received from Beck and others and published by Jones. Thus Trentecosta failed to prove reckless disregard on Jones' part.

Qualified Privilege
As noted earlier, qualified privilege was a defense in a common law defamation action. However, under the jurisprudence engendered by Sullivan and Gertz which requires some defamation plaintiffs to prove actual malice with regard to the falsity of the statement, such proof also proves the lack of any reasonable grounds for belief in the truth of the statement, which is the equivalent of *563 proving the defendant's abuse of any privilege urged as a defense.[14]
Arguably, conditional privileges therefore have lost their significance under the current state of the law which requires the offended person to prove the publisher's fault with regard to the falsity of the statement, at least when proof of actual malice is required as an element of the cause of action. Nevertheless, we will discuss the qualified privilege asserted by Officer Smith in the present case.
Defendants contend they are entitled to a qualified privilege as law enforcement officers who report information regarding criminal investigations and resulting arrests. Defendants, joined by amicus curiae, contend that the lower courts' failure to recognize a qualified privilege in this context will have a chilling effect on law enforcement officers' willingness to release to the press statements regarding criminal investigations and arrests, which is information that the public should be given.
Whether law enforcement officers have a qualified privilege in releasing information to the public through the press about a criminal investigation and an arrest is an issue that this court has never addressed.[15]
There are a variety of situations in which the interest that defendants are seeking to vindicate or to further is regarded as sufficiently important to justify some latitude for making mistakes so that publication of defamatory statements should be conditionally or qualifiedly privileged. Prosser and Keeton on Torts, supra, at § 115. It is impossible to reduce the scope of a qualified privilege to any precise formula. Id. However, a qualified privilege has been extended to include not only the situations in which the parties have a common interest or duty to communicate between themselves over matters in the public interest, as in the Toomer case cited by the court of appeal, but also those situations in which there is a reporting of governmental proceedings and activities.
Restatement (Second) of Torts § 611 (1977) provides:
The publication of a defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.
While noting that the primary party to whom this privilege extends is the media, Comment (c) to Section 611 states that the privilege is not limited to media defendants, but rather that "[i]t extends to any person who makes an oral, written or printed report to pass on the information that is available to the general public." Comment (h) further states:
An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police *564 or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section. (emphasis added).
The decision in Francois v. Capital City Press, 166 So.2d 84 (La.App. 3d Cir.1964), cited in Prosser and Keeton on Torts, supra at § 115 n. 43, is illustrative of the treatment accorded the issue by Louisiana courts. Summarizing several of this court's earlier cases, the court held that a qualified or conditional privilege exists in Louisiana to report the fact that a person was arrested and the charges for which the person is being held, provided that the report does not assume the guilt of the accused person and is not otherwise defamatory.
While we agree that law enforcement officers, whose duty includes charging persons with crimes, should be allowed to report the fact of a criminal investigation and an arrest without fear of a defamation action if the person is cleared of the charges, an officer cannot add additional injurious statements that the officer had no reason to believe were true. Such a restriction of the privilege should not have a chilling effect on the free reporting of criminal investigations and arrests, but should prevent occurrences such as in the present case where the officer not only reported the investigation and arrest, but also reported facts pertaining to guilt that were not developed in the investigation.
We conclude that the statement by Officer Smith to the newspaper reporter exceeded the limits of any qualified privilege for fair reporting of investigations or arrests. While that qualified privilege arguably was available to the troopers in their role as law enforcement officers reporting the facts of an investigation and a resulting arrest to the press and, in turn, to the public, the unfounded statements regarding Trentecosta's operation's bilking of charitable organizations exceeded the permissible scope of that privilege and constituted an abuse of that privilege.[16]
Because we conclude that only one statement was actionable, we remand the case to the court of appeal to reconsider the amount of damages in the light of that revision of the judgment. Moreover, the court of appeal, in fixing anew the amount of damages, should consider that the defamation award in this case must be based not on the damages caused by the arrest or by the license suspension, but on the damages caused by the defamatory statement.

Decree
For the foregoing reasons, the judgments of the lower courts are set aside, and judgment is rendered against Kermit Smith and the State of Louisiana, Department of Public Safety & Corrections, in solido, for the damages caused by Smith's defamation. The case is remanded to the court of appeal to fix the amount of those damages.
VICTORY, J., not on panel. Rule IV, Part 2, § 3.
JOHNSON and TRAYLOR, JJ., dissent and assign reasons.
JOHNSON, Justice, dissenting.
The question of whether a private individual can recover damages when factual misstatements are made about a public issue was presented, addressed and disposed of by this court in Romero v. Thomson Newspapers, 94-1105, (1/17/195); 648 So.2d 866. Romero involved a physician seeking damages against several defendants based on a newspaper *565 article criticizing the high incidence of Caesarean sections performed in this state. The article provided that women in Louisiana were being "butchered" by their obstetricians based on the many surgeries performed. It further stated that Abrom Kaplan Memorial Hospital in the Lafayette area had the highest number of Caesareans out of the 2,657 hospitals in the 34 states analyzed. The plaintiff, Dr. Romero, was singled out because he was the only obstetrician at this hospital. The defendants filed a motion for summary judgment to dismiss plaintiffs' complaint. The trial court denied summary judgment and the Third Circuit Court of Appeal denied review.
Relying on Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), we held in Romero that private plaintiffs with a defamation claim for factual misstatements on a public issue cannot recover either presumed or punitive damages without the showing of actual malice. In other words, private and public plaintiffs must still meet the requirement of proving "actual malice" as described in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
Further, we noted that misstatements relating to matters of public concern will still receive full protection from the constitution. Id. at 870. See also, Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Mashburn v. Collin, 355 So.2d 879 (La.1977) makes it clear that an opinion expressed on a matter of "public concern" cannot form the basis of an action for defamation. Ordinarily, "a defamation action based on an expressed opinion must fall, unless the opinion implies a false and libelous fact and the opinion was expressed with actual malice. Bussie v. Lowenthal, 535 So.2d 378 (La.1988)". Romero at 870.
The majority concedes that this investigation which involved the illegal operation of a charitable gaming facility, is a matter of public interest. In my opinion, the statements by the State Police officers, Robert Beck, Sgt. Kermit Smith and Lt. Ronnie Jones fall within the parameters of protection as stated in Romero and the cases cited therein. The majority holds that Sgt. Smith's "bilking" statement was made with such "reckless disregard" of its falsity that liability follows.
Plaintiff has not met his burden of proof that the statement was made with knowing and reckless disregard for its falsity. Because there was no proof of "actual malice", damages are improper. "There can be no recovery without proof of malice, even if there were a defamatory implication. Bussie v. Lowenthal." Romero at 870.
Accordingly, for the reasons expressed above, I dissent.
TAYLOR, Justice, dissenting.
I would find that the plaintiff is an involuntary public figure and, as such, must prove, by clear and convincing evidence, actual malice on the part of Officer Smith. The United States Supreme Court, in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), identified involuntary public figures as those who are directly affected by the action of public officials. Defendants in criminal cases, as was Mr. Trentecosta, are limited public figures with respect to news items concerning that case. See LAWRENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 880 (2d ed.1988).
"The burden of proving "actual malice" requires a plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984) (emphasis added), citing New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). The focus then is not, as the majority claims, "whether the publisher had a reasonable basis for believing that the statements were true." Op. at 562. In fact, the Supreme Court has expressly rejected that proposition. St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The focus should instead be *566 whether Officer Smith seriously doubted the truth of his statement concerning the plaintiff. Because the plaintiff has not proved by clear and convincing evidence that Officer Smith made his statement with actual malicei.e., that he knew his statement was not true or that he seriously doubted the truth of his statementthe plaintiff should not prevail in this matter.
NOTES
[1] Thus if the organization collected $320, the rent was $20, but if the organization collected $910, the full rental payment was due.
[2] La.Rev.Stat. 33:4861.12 G provides:

No lease providing for a rental arrangement for premises or equipment shall provide for payment in excess of the reasonable market rental rate for such premises or equipment and in no case shall any payment be based on a percentage of gross receipts or profits derived from a game of chance.
[3] La.Rev.Stat. 33:4861.16 B provides in pertinent part:

Any person, association, or corporation which commits any of the following acts shall, upon conviction, be fined not more than five thousand dollars or imprisoned for one year, or both:
...
(5) Intentionally causing, aiding, abetting, or conspiring with another to cause any person to violate any provision of this Part. In addition to suffering any such penalty which may be imposed, a licensee shall forfeit any license issued to it under this Part.
[4] While administrative charges originally were levied against Trentecosta by the State Gaming Division, the Department pursued only the conspiracy violation and dropped the administrative charge regarding the rentals based on percentages of receipts.
[5] In a post-argument brief, plaintiffs informed the court that the criminal charges have now been dismissed.
[6] As to the latter exception, plaintiffs' petition asserts the solidary liability of the Department for the troopers' statements.
[7] Of course, whether Jones' making that statement constituted defamation under the circumstances is an entirely separate issue.
[8] A public figure is a non-public official who is intimately involved in the resolution of important public questions or who by reason of his fame shapes events in areas of concern to society at large. Butts, 388 U.S. at 164, 87 S.Ct. at 1996.
[9] The Court justified the higher standard in cases involving public officials or public figures on the basis that such persons have significantly greater access to channels of effective communication to counteract false statements and have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods.
[10] The plurality decision in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) would have extended the requirement of actual malice beyond public officials and public figures when the communication by a media defendant involved a matter of public or general interest. However, this plurality decision was later repudiated by Gertz.
[11] The decision in Romero v. Thomson Newspapers, while stating the plurality Rosenbloom standard among other general statements of broad legal principles, turned on the fact that "plaintiffs failed to show false factual statements in the article." 648 So.2d at 871. Moreover, Romero involved a media defendant.
[12] Indeed, the defendants are public officers.
[13] The Court in Butts actually addressed two companion cases, holding in Butts actual malice was established, yet holding it was not established in the companion case, Associated Press v. Walker.
[14] See Restatement (Second) of Torts § 592A (1977). See also Restatement § 600, which provides that the publisher abuses a privilege if he or she "(a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity."
[15] The Criminal Code recognizes a qualified privilege, relating to the crime of defamation, in La.Rev.Stat. 14:49, which provides:

A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:
(1) Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same.
(2) Where the publication or expression is a comment made in the reasonable belief of its truth, upon,
(a) The conduct of a person in respect to public affairs; or
(b) A thing which the proprietor thereof offers or explains to the public.
(3) Where the publication or expression is made to a person interested in the communication, by one who is also interested or who stands in such a relation to the former as to afford a reasonable ground for supposing his motive innocent.
(4) Where the publication or expression is made by an attorney or party in a judicial proceeding.
[16] The general principles regarding abuse of a qualified privilege are set out in Restatement (Second) of Torts §§ 599-600 (1977) as follows:

§ 599. General Principle
One who publishes defamatory matter concerning another upon an occasion giving rise to a conditional privilege is subject to liability to the other if he abuses the privilege.
§ 600. Knowledge of Falsity or Reckless Disregard as to Truth
Except as stated in § 602, one who upon an occasion giving rise to a conditional privilege publishes false and defamatory matter concerning another abuses the privilege if he
(a) knows the matter to be false, or
(b) acts in reckless disregard as to its truth or falsity.