28 So.3d 529 (2009)
Anton HEINE and Anton, Ltd.
v.
Julia REED and Harpercollins Publishers, L.L.C.
No. 2009-CA-0869.
Court of Appeal of Louisiana, Fourth Circuit.
December 16, 2009.
*531 C. Arlen Braud, II, Michelle O. Gallagher, Braud & Gallagher, LLC, Madisonville, LA, for Plaintiffs/Appellants.
Mary Ellen Roy, Dan Zimmerman, Phelps Dunbar, LLP, New Orleans, LA, For Defendants/Appellees.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
The plaintiffs/appellants, Anton Heine ("Heine") and Anton, Ltd., filed a defamation action against the defendants/appellees, Julia Reed ("Reed") and HarperCollins Publishers, L.L.C. ("HarperCollins"). The trial court sustained the defendants/appellees' exception of no cause of action, and the plaintiffs/appellants timely appealed. We find that the published statements do not meet the elements necessary to support a cause of action in defamation. Accordingly, we affirm the trial court's ruling.

*532 I. FACTUAL AND PROCEDURAL HISTORY
HarperCollins published a book entitled, The House on First Street: My New Orleans Story, written by the defendant/appellee, Reed, an author and a contributing editor for Newsweek and Vogue magazines. The book memorializes Reed's experiences living in New Orleans, both before and after Hurricane Katrina. In the epilogue, Reed recounts an illustrative story depicting a burglary that occurred at her home, including the theft of the computer upon which she was writing her book and heirloom jewelry. Reed descriptively chronicles her becoming aware that Anton "Feine" of "Anton's Fine Jewelry" (in actuality, the plaintiffs/appellants, respectively, Anton Heine and Anton, Ltd.)[1] were auctioning a piece of her stolen jewelry on the Internet and her encounter with Heine and law enforcement personnel as she attempted to recover her stolen property. Using colorful language and brazen prose, Reed's epilogue expresses her unabashed impressions regarding Heine and his business operations. Displeased with the unfavorable observations made by Reed in her book, Heine, personally and on behalf of Anton, Ltd., filed suit against Reed and HarperCollins for libel and defamation. Specifically, Heine asserts in the petition that the published aspersions expose him and his business to "contempt, hatred, ridicule or obloquy or otherwise causes [Heine and Anton, Ltd.] to be shunned or avoided and tends to lower their esteem in the community." The petition further avers that the language used by Reed deprives Heine and his business of the benefits of public confidence.
In response, HarperCollins and Reed excepted to the petition on the ground that it fails to state of cause of action because it fails to specifically identify any allegedly false and defamatory statements and fails to allege facts showing that the statements were made with the requisite degree of malice. The trial court sustained the exception of no cause of action and, determining that the "grounds of the objection raised through the exception cannot be removed by amendment of the petition," dismissed Heine's and Anton, Ltd.'s petition with prejudice. The plaintiffs/appellants timely appealed.

II. LAW AND DISCUSSION

A. Exception of No Cause of Action

The function of the peremptory exception of no cause of action is to question whether the law extends a remedy against the defendant to anyone under the actual allegations of the petition. The exception is triable on the face of the petition. For the purpose of determining the issues raised by the exception, the well-pleaded facts in the petition and any annexed documents must be accepted as true. La. C.C.P. arts. 927, 931; City of New Orleans v. Board of Com'rs of the Orleans Levee Dist., 93-0690, p. 2 (La.7/5/94), 640 So.2d 237, 241; Guste v. Hibernia Nat. Bank in New Orleans, 94-0264, p. 5 (La.App. 4 Cir. 5/16/95), 655 So.2d 724, 728. No evidence may be introduced to support or controvert the exception. However, a jurisprudentially recognized exception to this rule allows the court to consider evidence that is admitted in the trial court without objection to enlarge the pleadings. Schmidt v. Schmidt, 08-0263, p. 4 (La.App. 4 Cir. 2/11/09), 6 So.3d 197, 201.[2]
*533 An exception of no cause of action is likely to be granted only in the unusual case in which the plaintiff includes allegations that show on the face of the petition that an insurmountable bar to relief is present. Thus, dismissal is justified only when the allegations of the petition itself clearly show that the plaintiff does not have a cause of action, or when its allegations show the existence of an affirmative defense that appears clearly on the face of the pleadings. City of New Orleans, 93-0690, p. 29, 640 So.2d at 253.
In reviewing a trial court's sustaining an exception of no cause of action, an appellate court conducts a de novo review because the exception raises a question of law, and the trial court's decision is based solely on the sufficiency of the petition. Industrial Companies, Inc. v. Durbin, 02-0665, pp. 6-7 (La.1/28/03), 837 So.2d 1207, 1213; Cleco Corp. v. Johnson, 01-0175, p. 3 (La.9/18/01), 795 So.2d 302, 304.

B. Liability of Reed and HarperCollins for Defamation

In Louisiana, our standard for the "[f]reedom of [e]xpression" is found in Article I, § 7 of the 1974 Louisiana Constitution, which guarantees "every person" the right to "speak, write and publish his sentiments on any subject," but holds individuals "responsible for abuse of that freedom." This protection does not extend to statements or allegations that are defamatory. Wattigny v. Lambert, 408 So.2d 1126, 1131 (La.App. 3 Cir.), writ denied, 410 So.2d 760 (La.1981), cert. denied, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1981). See also, Hahn v. City of Kenner, 984 F.Supp. 436, 441 (E.D.La.1997). What constitutes an abuse of the right of freedom of speech is, in part, controlled by La. C.C. art. 2315 and the law of tort on defamation (libel and slander). See F. Maraist, Vol. II, Louisiana Practice Series, Louisiana Torts Law: Cases and Materials, pp. 609-628 (1991).
Defamation is a tort involving the invasion of a person's interest in his reputation and good name. Costello v. Hardy, 03-1146, p. 12 (La.1/21/04), 864 So.2d 129, 139; Fitzgerald v. Tucker, 98-2313, p. 10 (La.6/29/99), 737 So.2d 706, 715.[3] A plaintiff alleging a cause of action *534 for defamation must set forth in the petition with reasonable specificity the defamatory statements allegedly published by the defendant. Fitzgerald, 98-2313, p. 7, 737 So.2d at 713. A successful claimant in a defamation action must establish the following elements: (1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury. Gugliuzza v. K.C.M.C., Inc., 606 So.2d 790, 791 (La.1992). If even one of the required elements of the tort is lacking, the cause of action fails. Costello, 03-1146, p. 12, 864 So.2d at 140.
Louisiana courts have held that a communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community, deters others from associating or dealing with the person, or otherwise exposes a person to contempt or ridicule. Fitzgerald, 98-2313, p. 11, 737 So.2d at 716. See also Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559, citing RESTATEMENT (SECOND) OF TORTS § 559 cmt. e (1977). Words that convey an element of personal disgrace, dishonesty, or disrepute are defamatory. Costello, 03-1146, p. 13, 864 So.2d at 140; Fitzgerald, 98-2313, p. 11, 737 So.2d at 716. In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Brungardt v. Summitt, 08-0577, p. 8 (La.App. 4 Cir. 4/8/09), 7 So.3d 879, 885, citing Costello, 03-1146, p. 13, 864 So.2d at 139.
Words that expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, are considered defamatory per se. Brungardt, 08-0577, p. 8, 7 So.3d at 885. When the plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice are presumed, but may be rebutted by the defendant. Id. When the words at issue are not defamatory per se, the plaintiff must prove, in addition to defamatory meaning and publication, falsity and malice. Costello, 03-1146, p. 12, 864 So.2d at 140. Malice, or the lack of a reasonable belief in the truth of the statement, may sometimes be inferred or implied from the circumstances surrounding the communication. Lemeshewsky v. Dumaine, 464 So.2d 973, 975-976 (La.App. 4 Cir.1985). In cases involving statements about a public figure or a matter of public concern, however, the plaintiff must prove actual malice, that is, that the defendant either knew the statement was false or acted with reckless disregard for the truth. Romero v. Thomson Newspapers (Wisconsin), Inc., 94-1105, pp. 6-7 (La.1/17/95), 648 So.2d 866, 869-870.
The question of whether a communication is susceptible of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. Sassone v. Elder, 626 So.2d 345, 352 (La.1993). The question is answered by determining whether a listener (or reader) could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. Id. If the court determines that the words at issue are not capable of a defamatory meaning, the plaintiff's claim is not actionable. Sassone, 626 So.2d at 352.
In a defamation action, to determine whether a plaintiff has properly stated a cause of action, the first inquiry is whether the words used are defamatory. See Huxen v. Villasenor, 01-288, p. 3 (La. App. 5 Cir. 9/25/01), 798 So.2d 209, 212. Accordingly, we review the words published by Reed in the epilogue of her book referring to the plaintiffs/appellants to determine whether they are either defamatory *535 per se or susceptible of a defamatory meaning:
The dealer's name was Anton Feine [sic], from Anton's Fine Jewelry, an establishment that had not come up in Vasser's and my pawnshop search, but when I pulled up outside the building it was clear what kind of operation Anton was runningthere were more bars on the windows and doors than in most jails and two doors to be buzzed through before being allowed inside. Stupidly, I had called first. When I walked in, the prissy Anton, heavily bedecked in gold with a head of very badly dyed brown hair, was nervously flitting around while his sister, who looked like a gangster's moll, did all the talking. I couldn't see the earrings unless I paid for them, she said; further I'd have to leave the store until the police, whom I had called, arrived. I had no intention of doing any such thing and noted several conspicuous gaps in Anton's many display cases where items had been soldor hidden recently enough that they hadn't been replaced. When the Jefferson Parish deputy arrived, he took the earrings as "evidence" and gave me the number of a detective, Sergeant Martin Dunn, in the "pawnshop department." When I called Dunn from the car, he explained that the law required all pawnshop owners to take down the driver's license information of everybody they purchased items from and to provide a complete inventory of the stuff. Anton had reported the earrings, along with: a platinum and diamond circle pin that had been my mother's; a platinum and sapphire straight line bracelet that had been my grandmother'sand my thirtieth birthday present; the antique gold cuff bracelet, the one circulated on the news that had been a gift from John after a particularly festive Rib Room lunch together; a sapphire, diamond, and ruby brooch in the shape of a butterfly; two pairs of gold hoops, and finally, the diamond engagement earrings. It wasn't everything but it was a lot, and I was thrilled at the prospect of getting it back. But then Detective Dunn gave me the bad news: the law also states that pawnshop owners are not required to report who they sell their wares to or even keep trackthey were only required to return the stuff they still possessed. Anton, of course, was already claiming that he'd sold every other piece and had no idea to whom. Further, even if I managed to find some of the pieces myself, the new owners were not required to give them back, unlike what happens when you buy, say, a stolen car. All I could figure was that there must be one hell of a pawnshop lobby in Baton Rouge.
Compared to Orleans Parish, Jefferson Parish, which for years was run by the iron hand of the late Sheriff Harry Lee, a Chinese-American country music singer with a penchant for straight talk and a merciless attitude toward the criminal element, was a model of efficiency. Within the week, Detective Dunn had called me to say the earrings had been photographed and logged and that I could come pick them up. He was on Anton's case, he said, but there was nothing he could really force him to do. Then he showed me the black-and-white Xeroxed copy of the driver's license belonging to Anton's seller, a twenty-year-old black male with dreadlocks, a tattoo of a cross on the bridge of his nose, and indecipherable words tattooed on each cheek. The likelihood of his having legal access to almost a hundred thousand dollars worth of estate jewelry was nil and Anton sure would have known that the second he laid eyes on him. Even more disturbingly, I came to find out he *536 has a handful of steady clients, including some "nice" Garden District ladies I knowand who also have to know perfectly well that they're buying hot goods.
Under prodding from the good Detective Dunn, Anton finally coughed up the butterfly brooch to keep me at bay, and because there is no recourse against him in the criminal courts, John filed a civil suit against him, though he is so cagy it took weeks to serve the papers. The seller (who may or not be the actual thief) is currently in jail for another crime and I am trying to figure out how to get to him to ask him where he might have sold the remaining stuff.
Sometimes a publication is capable of being read with two different meanings; one that is defamatory or one which is innocent Such is not the case before us, however.
In their brief on appeal and again during oral argument, counsel for plaintiffs/appellants narrowed the issue to only one published statement, which they claim contains the elements necessary to sustain a defamation action:
I came to find out he has a handful of steady clients, including some "nice" Garden District ladies I knowand who also have to know perfectly well that they're buying hot goods.
We disagree with the plaintiffs/appellants that this statement is either defamatory per se or capable of a defamatory meaning. The only reference to Heine in this sentence is that he has a "handful of steady clients" that includes some "`nice' Garden District" ladies that Reed knows. The remainder of the sentence, if anything, is disparaging to these unnamed Garden District ladies, who Reed opines must have known were "buying hot goods." In short, Reed insinuates that the Garden District ladies had knowledge of the monetary value or high quality of the items they were purchasing from Heine's store and, therefore, they must have known they were buying stolen goods. The statement, however, says nothing nor does it implythat Heine actually knew anything about the true value of the items he was buying and selling or that he was knowingly selling stolen goods.[4] While certainly cleverly couched and carefully written by Reed, we cannot say that this sentence, singled out by the plaintiffs/appellants as forming the basis for their defamation action, constitutes defamation per se or rises to the level of "defamatory words."
Having failed to meet the threshold requirement for establishing a cause of action in defamation, we hold the trial court properly sustained HarperCollins' and Reed's exception of no cause of action. When an exception of no cause of action is granted, and the grounds for the exception cannot be removed by amendment of the petition, then the petition must be dismissed. La. C.C.P. art. 934. In ruling on the exception of no cause of action, the trial court considered each of the statements about the plaintiffs/appellants contained in Reed's epilogue and correctly concluded that none of the statements were defamatory.[5] Consequently, the *537 grounds for the exception cannot be removed by amendment of the petition, and we find the trial court correctly dismissed the plaintiffs/appellants' petition, with prejudice.

CONCLUSION
We have reviewed the plaintiffs/appellants' petition and the epilogue written by Reed and published by HarperCollins. Accepting the well-pleaded factual allegations as true, we find the plaintiffs/appellants have failed to allege any statements made by the defendants/appellees that rise to the level of defamation. Accordingly, we conclude that the facts alleged by the plaintiffs/appellants do not state a cause of action for defamation, and the trial court correctly dismissed the plaintiffs/appellants' claims for defamation against HarperCollins and Reed.

DECREE
For the reasons set forth above, we affirm the judgment of the trial court.
AFFIRMED.
ARMSTRONG, C.J., concurs in the result.
I would affirm the judgment of the trial court. Therefore, I respectfully concur in the result reached by the majority.
NOTES
[1] Heine owns Anton's, Ltd.
[2] The portion of the epilogue in Reed's book that refers to the plaintiffs/appellants was included, without objection, as an exhibit to the memorandum in support of the defendants/appellees' peremptory exception of no cause of action and as an exhibit to the plaintiffs/appellants' opposition to the exception. Thus, the epilogue was properly considered by the trial court in granting the exception of no cause of action. See City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1179, p. 10 (La.3/2/99), 739 So.2d 748, 756 (documents submitted without objection may be considered in ruling on exception of no cause of action).
[3] The substantive criminal law on defamation may be considered in determining the substantive civil law on defamation. See, for example, Gugliuzza v. KCMC, Inc., 593 So.2d 845 (La.App. 2 Cir.), rev'd on other grounds, Gugliuzza v. K.C.M.C., Inc., 606 So.2d 790, 793 (La. 1992)

The Louisiana Criminal Code in La. R.S. 14:47 defines defamation in pertinent part as follows:
Defamation is the malicious publication or expression in any manner, to anyone other than the party defamed, or anything which tends:
(1) To expose any person to hatred, contempt, or ridicule, or to deprive him of the benefit of public or social intercourse; or
(2) To expose the memory of one deceased to hatred, contempt, or ridicule; or
(3) To injure any person, corporation, or association of persons in his or their business or occupation.
The Louisiana Criminal Code further addresses the "presumption of malice" in La. R.S. 14:48:
Where a non-privileged defamatory publication or expression is false it is presumed to be malicious unless a justifiable motive for making it is shown.
Where such a publication or expression is true, actual malice must be proved in order to convict the offender.
[4] Moreover, Reed acknowledges, although apparently begrudgingly, that that neither plaintiff did anything illegal when she states:

[T]he law required all pawnshop owners to take down the driver's license information of everybody they purchased items from and to provide a complete inventory of the stuff. . . . [T]he law also states that pawnshop owners are not required to report who they sell their wares to or even keep track they were only required to return the stuff they still possessed. . . . All I could figure was that there must be one hell of a pawnshop lobby in Baton Rouge.
[5] Some of Reed's comments about Heine and his sister are opinion and/or commentary, that although subject to being characterized as unkind and insensitive, can be understood to be "fair" comment, to-wit:

When I walked in, the prissy Anton, heavily bedecked in gold with a head of very badly dyed brown hair, was nervously flitting around while his sister, who looked like a gangster's moll, did all the talking.
And comments that Reed makes about the purported thief can be read as bigoted, to-wit:
Then he showed me the black-and-white Xeroxed copy of the driver's license belonging to Anton's seller, a twenty-year-old black male with dreadlocks, a tattoo of a cross on the bridge of his nose, and indecipherable words tattooed on each cheek. The likelihood of his having legal access to almost a hundred thousand dollars worth of estate jewelry was nil and Anton sure would have known that the second he laid eyes on him.