STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-253

CALVIN W. BRAXTON, SR.

VERSUS

LOUISIANA STATE TROOPERS ASSOCIATION, ET AL.

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-90284 A
HONORABLE JIMMIE C. PETERS, DISTRICT JUDGE AD HOC

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Van H. Kyzar, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

AFFIRMED.

**Jill L. Craft**
**W. Brett Conrad, Jr.**
**329 St. Ferdinand Street**
**Baton Rouge, LA 70802**
**(225) 663-2612**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
       **Calvin W. Braxton, Sr.**

**Jeff Landry**
**Attorney General**
**Steven M. Oxenhandler**
**Michael J. O'Shee**
**Special Assistant Attorneys General**
**P. O. Box 6118**
**Alexandria, LA 71307-6118**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **Jay Oliphant**

**Jeff Landry**
**Attorney General**
**Ben L. Mayeaux**
**Jennie P. Pellegrin**
**Special Assistant Attorneys General**
**1001 West Pinhook Road, Suite 200**
**Lafayette, LA 70503**
**(337) 237-7000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **Louisiana Department of Public Safety and Corrections**
       **(Office of State Police)**

**Floyd J. Falcon, Jr.**
**Avant & Falcon**
**P. O. Box 2667**
**Baton Rouge, LA 70821**
**(225) 387-4492**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **Louisiana State Troopers Association**

**KYZAR, Judge.**

In this defamation action, the plaintiff, Calvin W. Braxton, Sr., a former member of the Louisiana State Police Commission, appeals the partial summary judgment granted in favor of the defendant, Colonel Jay Oliphant, dismissing his defamation claims pertaining to a March 2, 2018 Incident Report prepared by Colonel Oliphant and filed with the Louisiana State Police (LSP). He further appeals an attorney fee award of $50,376.25 in favor of the defendant, State of Louisiana, Department of Public Safety and Corrections (Office of LSP), for its successful pursuit of a special motion to strike Mr. Braxton's defamation claims against it pursuant to La.Code Civ.P. art. 971. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This case has previously been before this court in *Braxton v. Louisiana State Troopers Association*, 21-355, pp. 1–2 (La.App. 3 Cir. 1/5/22), 333 So.3d 516, 520–21 (alteration in original), *writ denied*, 22-201 (La. 4/20/22), 336 So.3d 467, wherein we set forth the factual background leading to this litigation, including the underlying basis for the issues we are faced with in this appeal:

> Calvin Braxton filed a defamation suit against the State of Louisiana, Department of Public Safety and Corrections, Office of State Police (State Police); Louisiana State Trooper Colonel Jay Oliphant; and the Louisiana State Troopers Association (LSTA). The trial court granted a special motion to strike filed by the State Police pursuant to La.Code Civ.P. art. 971, dismissing it from the litigation. A partial motion for summary judgment based on prescription was granted in favor of Colonel Oliphant dismissing the defamation claim based on the content of a written Incident Report dated June 2, 2016. Mr. Braxton appeals both of these rulings.

## FACTS

> In written reasons for judgment on the motion for partial summary judgment, the trial court did an excellent job of stating the undisputed facts leading up to this litigation as follows (alteration in original):

This litigation involves two separate factual scenarios which give rise to Mr. Braxton's claims for defamation damages. The first factual scenario is set out in his May 10, 2018 initial petition naming as defendants Colonel Oliphant and the Louisiana State Troopers Association (hereinafter "LSTA"), a nonprofit entity organized to represent the interests of its members. These claims arise from an Incident Report bearing the date of June 2, 2016 (hereinafter referred to as "the Incident Report"), prepared by Colonel Oliphant, and filed through proper channels with his employer, the State of Louisiana, Department of Public Safety and Corrections, Office of State Police (hereinafter "the State Police").

The second factual scenario is set out in Mr. Braxton's February 20, 2020 supplemental and amending petition which names Colonel Oliphant and the State Police as defendants. These claims arise from a second incident report dated March 2, 2018, prepared by Colonel Oliphant, filed through proper channels with the State Police and used by the State Police in a subsequent investigation involving Mr. Braxton. The consequences of this second Incident Report are not before the court in this motion for partial summary judgment. [This report is involved in the special motion to strike action].

Therein, we affirmed the trial court's grant of the special motion to strike Mr. Braxton's cause of action as against LSP. We further affirmed its judgment finding that Mr. Braxton's claims against Colonel Oliphant, based on the contents of the June 2, 2016 Incident Report, were prescribed. Thereafter, LSP, as the prevailing party on the motion to strike, filed a motion for attorney fees and costs against Mr. Braxton, as per La.Code Civ.P. art. 971(B). Following a hearing thereon, the trial court awarded LSP the sum of $50,376.25 in attorney fees, plus court costs. A written judgment was rendered on this issue on September 28, 2022.

Subsequently, Colonel Oliphant filed a motion for summary judgment seeking dismissal of Mr. Braxton's defamation claims arising from the contents of the March 2, 2018 Incident Report prepared by him and filed with LSP and an April 3, 2018 Facebook posting. After a hearing on the motion, the trial court took the matter under advisement, and thereafter, rendered judgment on September 28, 2022, granting in

part and denying in part Colonel Oliphant's motion. The trial court granted the motion as to the Incident Report but denied it as to the Facebook posting. Pursuant to an October 17, 2022 judgment, the partial summary judgment was deemed a final, appealable judgment.

Mr. Braxton now appeals both judgments, asserting the following assignments of error:

1. [Louisiana Code of Civil Procedure Article] 971 permits an award of attorney fees and costs to a "prevailing party", but only those fees and costs directly attributable to drafting, filing, and arguing the Art. 971 Motion. Hence, award of additional amounts not directly attributable to the Art. 971 Motion is erroneous.

2. Publication of the March, [sic] 2018, crime allegations by defendant Oliphant is clearly defamatory and defamatory per se rendering partial summary judgment inapplicable and, importantly, for which no conditional or qualified privilege attaches. The lower court's acceptance, to the exclusion of countervailing record evidence by the non-moving party[,] was erroneous.

## DISCUSSION

### *Attorney Fees and Costs*

In his first assignment of error, Mr. Braxton contends that the trial court erred in awarding $50,376.25 in attorney fees to LSP as La.Code Civ.P. art. 971 permits an award of only those fees and costs "directly associated with the drafting, filing, and arguing [of] a Special Motion to Strike."

Louisiana Code of Civil Procedure 971(A)(1) provides for a special motion to strike, as follows:

A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

3

It further provides that "[i]n any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs." La.Code Civ.P. art. 971(B). "The plain wording of La.Code Civ.P. art. 971(B) (emphasis added) states the prevailing party on a special motion to strike '***shall be awarded*** reasonable attorney fees and costs[,]'" and "[t]here is no qualification to that mandatory requirement." *Arsement v. Bruchhaus*, 19-546, p. 5 (La.App. 3 Cir. 5/6/20), 297 So.3d 930, 933.

In *Braxton*, we affirmed the trial court's granting of a special motion to strike the cause of action asserted by Mr. Braxton against LSP. The propriety of that ruling is not at issue here, as it is final. The only issue before us is whether the trial court erred in fixing the attorney fees due to LSP in the sum of $50,376.25 for its successful motion to strike.

A trial court has great discretion in determining an award of attorney fees. *Corbello v. Iowa Production*, 02-826 (La. 2/25/03), 850 So.2d 686. Under the abuse of discretion standard, "the role of the reviewing court is not to determine what it considers to be an appropriate award, but rather it is to review the exercise of discretion by the trier of fact." *Covington v. McNeese State Univ.*, 12-2182, p. 11 (La. 5/7/13), 118 So.3d 343, 351. However, the trial court's factual findings are reviewed pursuant to the manifest error standard of review. *Id.*

In *Rivet v. State, Department of Transportation and Development*, 96-145, pp. 11–12 (La. 9/5/96), 680 So.2d 1154, 1161–62 (footnote omitted) (quoting *State, Department of Transportation and Development v. Williamson*, 597 So.2d 439, 442 n.9 (La.1992)), the supreme court set out the factors to be considered in determining the reasonableness of an attorney fee, as follows:

> (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge,

4

attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. *Id.* at 442. We have further noted that these factors are derived from Rule 1.5(a) of the Rules of Professional Conduct, which provides:

(a) A lawyer's fees shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

An attorney fee award is determined on a case-by-case basis as "[e]ach case is considered in light of its own facts and circumstances, but the amount awarded must be reasonable." *Quinlan v. Sugar-Gold*, 53,348, p. 11 (La.App. 2 Cir. 3/11/20), 293 So.3d 722, 730, *writ denied*, 20-744 (La. 10/6/20), 302 So.3d 536. "The trial court has discretion to determine the amount of an attorney fee based upon the court's own knowledge, the evidence, and the court's observation of the case and the record." *Id.* "A court does not have to hear evidence concerning time spent or hourly rates charged in order to make an award since the record will reflect much of

5

the services rendered. Likewise, a court, in awarding attorney fees, is not bound by the amount actually charged by the attorney." *Id.* at 731 (citation omitted).

In its September 28, 2022 written reasons for judgment, the trial court, after considering the ten factors set forth in *Rivet*, held as follows:

(1)     Counsel for the State Police obtained the ultimate successful result—dismissal of the claims against their client with prejudice.

(2)     Despite the seemingly insignificant beginning, this has evolved into significant litigation as to all issues. In fact, Mr. Braxton's attachments to the filings in the record suggest that witnesses who might be called to the trial on the merits include past and present members of the executive and legislative branches of state government at the highest level, as well as past and present senior administrators of the State Police. Thus, the responsibility of counsel for the State Police involved recognition and evaluation of issues not normally found in basic litigation.

(3)     That special responsibility of the counsel for the State Police carries over to the third factor, the importance of the litigation. Basically, Mr. Braxton accused the State Police of defaming him by asking questions to potential witnesses concerning an incident brought to the attention of the State police by Col. Oliphant through official channels. In other words, the result of the litigation would touch the very heart of the ability of the State Police to carry out even the most basic investigation.

(4)     While Mr. Braxton's pleadings do not set forth any specific amount of monetary compensation he seeks to recover, it is obvious from the nature and extent of this litigation that that figure is not insignificant.

(5)     The work performed by counsel for the State Police was both extensive and necessary. The State Police was brought into the litigation almost two years after it began, and the combination of discovery and hearings on various pretrial motions had expanded the factual basis to a considerable degree.

(6)     Counsel for the State Police fully understood and addressed the legal issues advantageous to their client's best interests, and through their skill and expertise, the ultimate favorable result was obtained for their client—a denial of supervisory writs by the Louisiana Supreme Court.

6

(7)   Counsel for the State Police physically appeared before this court only once, and that was to argue the merits of the Special Motion to Strike. However, the record also reflects a physical appearance before the Louisiana Third Circuit Court of Appeal to argue the merits of Mr. Braxton's appeal of the dismissal of the Special Motion to Strike. Furthermore, counsel for the State Police were required to appear at numerous depositions taken in the litigation.

(8)   Mr. Braxton's pleadings establish that the intricacies of the facts involved in the litigation are complex. The initial pleading by itself involves assertions concerning his political appointment by a Louisiana governor to the Louisiana State Police Commission; his subsequent personal investigation of the institution to which he was appointed and of its relationship with the Louisiana State Troopers Association (a nonprofit/ nongovernmental entity); his assertion that his daughter's traffic stop and the subsequent fallout from that incident, caused basically by his reaction to that incident, was a part of an effort to punish him for his investigation; the purported public and political nature of his removal from the Louisiana State Police Commission; and other purported attempts to defame him by the Louisiana State Troopers Association. In the amending petition which added the State Police as a defendant, Mr. Braxton referred to prior deposition testimony from both Colonel Oliphant and other witnesses concerning their publication of the false statements concerning the subsequent State Police investigation that led to that entity being joined as a defendant.

(9)   The diligence and skill of counsel. Counsel chose the Special Motion to Strike instead of a Summary Judgment motion as the vehicle to seek relief—and one can assume that the choice was made specifically because of the attorney fee provision. Counsel obtained the relief sought in the trial court and successfully defended that ruling through the appellate review process.

(10)   The only factual issue to be decided is whether the hourly rate was reasonable. That falls in the court's knowledge to decide that issue, and this court finds that $175.00 is a fair and reasonable hourly rate for the legal services performed. The court does, however, find that such a rate for travel only is excessive, and reduces that rate to one-half of the hourly rate for legal services rendered, or $87.50 per hour.

Furthermore, the court finds no meri[t] in Mr. Braxton's argument that the State Police should not be compensated for the time spent by their attorneys in reviewing the record, transcripts, and depositions already existing when it was jointed as a defendant. When named as a defendant in this matter, the State Police was immediately faced with Mr. Braxton's extensive allegations which gave rise to Col. Oliphant's preparation of the State Police Incident Report--the basis of the State Police's investigation. Had not counsel for the State Police fully investigated the background giving rise to that entity's involvement in the litigation, such failure would be a severe professional misstep on his or her part.

The court agrees with Mr. Braxton's argument that the State Police is not entitled to recover for travel expenses such as mileage or overnight lodging. However, the State Police does not request travel expenses in the general sense of the word. Instead, the State Police request only that its attorneys be reimbursed for their time traveling which was necessitated by Mr. Braxton's claims against their client. That is to say, an attorney only gets compensated for his or her time, and when traveling he or she is unable to use that time for other clients. Thus, despite the fact that the court has reduced that hourly rate for the time traveled, the court finds that it is compensable.

Mr. Braxton also argues that both La.Code Civ.P. art. 971(B) and the applicable jurisprudence "limits any award of fees to work *directly* associated with the drafting, filing, and arguing a Special Motion to Strike." (Emphasis added). The court agrees with that assertion of the rule of law, but it is not applicable to [this] matter. Counsel for the State Police do not seek an award for any overlapping litigation, and nothing in the record suggests that any of the work for which the State Police seek reimbursement was not directly associated with the preparation and/or presentation of its Special Motion to Strike; and nothing in the record suggests that the services rendered were in conjunction with any other issue or litigation.

DISPOSITION

This court finds the hourly rate of $175.00 to be a reasonable fee for services rendered in this matter, but reduces that fee for the requested travel reimbursement to $87.50 per hour. Further, the court finds the Summary of Billing Entries filed in open court at the hearing on this matter to be an accurate summary of the time spent by counsel for the State Police and, after being adjusted for the travel entries, finds that the State Police is entitled to a judgment of attorney fees in the amount of $50,376.25.

After reviewing the record, we find no abuse of discretion in the trial court's

award of $50,376.25 in attorney fees to LSP. The trial court thoroughly reviewed the

ten factors set forth in *Rivet* and determined that the 98.8 hours set forth in the billing

8

ledger submitted by LSP's counsel was reasonable. Considering the complexity of the litigation, LSP's late entry into the suit, and the fact that the only defense raised by LSP in response to Mr. Braxton's defamation claim was its La.Code Civ.P. art. 971 motion to strike, this finding by the trial court was reasonable.

We further find no manifest error in the trial court's determination that an hourly rate of $175.00 for work performed by LSP's counsel was reasonable. During the hearing before the trial court, Mr. Braxton's counsel admitted that the maximum hourly rate the State could be charged for attorney fees was $175.00; thus, Mr. Braxton benefited from this rate as LSP's counsel indicated in his affidavit that his normal hourly rate was between $275.00 to $300.00.[1] We also find no manifest error in the trial court's determination that an hourly rate of $87.50 for the 26.7 hours counsel traveled relative to LSP's motion to strike was reasonable. Although counsel for LSP initially requested that his travel time be reimbursed at $175.00 per hour, he later admitted that the State only reimburses travel time at fifty percent of the hourly rate charged for work performed.

Mr. Braxton further claims that the trial court erred in awarding costs to LSP as "LSP failed to specify the actual costs sought and admits it did not pay any costs under La. R.S. 13:4521." This is the entirety of its argument on this issue. However, we find no merit in this argument.

Louisiana Revised Statutes 13:4521(B) specifically provides that while the costs owed by a governmental entity are temporarily deferred, they must be paid by the party assessed with costs, either the governmental entity or the opposing party, within thirty days of the rendition of a final judgment. When the opposing party is

_____

[1] In his August 25, 2022 letter to the trial court, counsel for LSP stated that his firm had so far been paid a total of $115,619.93 for defending the State against Mr. Braxton's defamation claim.

9

cast with costs, the governmental entity has a duty to assist in the collection of the costs. La.R.S. 13:4521(B). It does so "by requesting the court to tax costs in accordance with the provisions of Article 1920 of the Code of Civil Procedure by requesting that the court include the cost assessment in a judgment dismissing a claim against the governmental entity[.]" *Id.* Louisiana Code of Civil Procedure Article 1920 provides, in part, that "[u]nless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause." Thus, although LSP was not required to pay court costs up front, it can request that these deferred costs be taxed to Mr. Braxton by a rule to show cause.

Accordingly, we find no abuse of discretion and no manifest error in the trial court's award of $50,376.25 in attorney fees to LSP pursuant to its successful motion to strike. We further find that LSP is entitled to have the costs assessed to Mr. Braxton, with the amount to be determined pursuant to a rule to show cause. This assignment of error is dismissed as being without merit.

***Partial Summary Judgement***

In his second assignment of error, Mr. Braxton asserts that the trial court erred in dismissing his claims as to the March 2, 2018 Incident Report concerning crime allegations made by Colonel Oliphant via a partial summary judgment. He urges that the report, which Colonel Oliphant published to LSP, is clearly defamatory and defamatory per se, rendering the partial summary judgment inapplicable and for which no conditional or qualified privilege attaches. Further, Mr. Braxton asserts that the trial court's acceptance of Colonel Oliphant's evidence submissions to the exclusion of the countervailing record evidence he submitted as the non-moving party was erroneous.

"A party may move for summary judgment for all or part of the relief for which he has prayed." La.Code Civ.P. art 966(A)(1). "[S]ummary judgment shall be

10

granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3). Summary judgment procedure is now favored under our law, and "the procedure is designed to secure the just, speedy, and inexpensive determination of every action," and "shall be construed to accomplish these ends." La.Code Civ.P. art. 966(A)(2). Louisiana Code of Civil Procedure Article 966(D)(1) provides the burden of proof in summary judgment proceedings as follows:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

"Summary judgment should be granted, if the parties have had the opportunity to conduct 'adequate discovery' and the evidence shows there is 'no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law.'" *Laforge v. Golden Nugget Lake Charles, LLC*, 20-110, p. 3 (La.App. 3 Cir. 11/4/20), 307 So.3d 266, 269; La.Code Civ.P. art. 966(A)(3). Appellate review of the grant of summary judgment is *de novo*, using the same criteria that governs the trial court's determination of whether summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991). "Applicable, substantive law determines whether a fact is material on summary judgment[.]" *Thomas v. Dalal*, 20-65, p. 5 (La.App. 3 Cir. 10/28/20), 306 So.3d 507, 511.

We first look to the substantive law pertaining to defamation in order to determine the propriety of the summary judgment granted herein:

11

Emanating from La. C.C. art. 2315, defamation is a tort involving the invasion of a person's interest in his or her reputation and good name. **Kennedy [v. Sheriff of E. Baton Rouge,]** 05-1418[, p. 4 (La. 7/10/06)], 935 So.2d [669,] 674; **Costello v. Hardy**, 03-1146, p. 12 (La. 1/21/04), 864 So.2d 129, 139. Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Id.*; RESTATEMENT (SECOND) OF TORTS § 558 (1977). As we explained in **Costello**, the fault requirement is generally referred to in the jurisprudence as malice, actual or implied. **Costello**, 03-1146 at 12, 864 So.2d at 139.

Given the foregoing, in order to prevail on a defamation claim, a plaintiff must prove " 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.' " *Id.* (quoting **Trentecosta v. Beck**, 96-2388, p. 10 (La. 10/21/97), 703 So.2d 552, 559). If even one of the required elements of the tort is lacking, the claim fails. *Id.*

*Johnson v. Purpera*, 20-1175, pp. 11–12 (La. 5/13/21), 320 So.3d 374, 386–87.

As to the third element, fault on the part of the publisher, if the party asserting the defamation claim is a public official or public figure, they must prove that the alleged statement was made with actual malice, i.e., with the knowledge that it was false or with reckless disregard of whether it was false. *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418 (La. 7/10/06), 935 So.2d 669. Thus, a mere showing of implied malice is insufficient to prove defamation in a claim brought by a public official or public figure. *Id.* Whether a person is a public official or public figure is a question of law for the court to resolve. *Johnson*, 320 So.3d 374.

Considering Mr. Braxton's impressive business accomplishments together with his two appointed public office positions,[2] we find that he is a public figure for purposes of this case, or at the least a limited purpose public figure. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975 (1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974). As such, his burden at trial is to show that the statements

---

[2] In addition to his tenure on the State Police Commission, Mr. Braxton also served as a member of the Southern University Board of Supervisors.

made in the March 2, 2018 Incident Report by Colonel Oliphant to LSP were made with actual malice, that is, knowledge that the statements were false or made with reckless disregard of whether the statements were false or not; and actual malice must be proven with convincing clarity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710 (1964). This finding is further in line with the burden of proof concerning a qualified privilege, as discussed below.

In his motion for summary judgment, Colonel Oliphant pointed out that Mr. Braxton would be unable to establish at trial that the statements made by him were defamatory and were an unprivileged communication made to a third party. As we find this last assertion dispositive of Mr. Braxton's claims regarding the March 2, 2018 Incident Report, we will address it first.

The law pertaining to conditional or qualified privilege was set forth by the supreme court in *Kennedy*, 935 So.2d at 681, as follows:

> In Louisiana, privilege is a defense to a defamation action. *Costello* [*v. Hardy*], 03-1146[, p.] 15 [(La. 1/21/04)], 864 So.2d [129,] 141. The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability. *Toomer v. Breaux*, 146 So.2d 723, 725 (La.App. 3 Cir.1962). Privileged communications are divided into two general classes: (1) absolute; and (2) conditional or qualified. *Madison v. Bolton*, 234 La. 997, 102 So.2d 433, 439 n. 7 (1958). An absolute privilege exists in a limited number of situations, such as statements by judges and legislators in judicial and legislative proceedings. *Id.* A conditional or qualified privilege arises in a broader number of instances. *Id.*

The case at hand does not involve an absolute privilege but rather the claim of a qualified privilege. In *Smith v. Our Lady of the Lake Hospital, Inc.*, 93-2512, p. 18 (La. 7/5/94), 639 So.2d 730, 745, the supreme court held that the analysis for determining whether a qualified privilege exists involves a two-step process:

> First, it must be determined whether "the attending circumstances of a communication occasion a qualified privilege," which means that a determination must be made of whether the requirements for invoking

13

the privilege are satisfied. *Soentgen* [*v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d [73,] 78–79 [(N.D. 1991)]. The second step of the analysis requires a determination of whether the privilege was abused, which requires that the grounds for abuse—malice or lack of good faith—be defined. *Id.* While the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury "[u]nless only one conclusion can be drawn from the evidence." *Prosser & Keeton on Torts, supra* at § 115, p. 835; *Restatement (Second) of Torts* § 619.

"Otherwise defamatory publication enjoys a qualified conditional privilege if made in good faith, on any subject matter in which in which the person communicating has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty." *Watson v. Willis-Knighton Med. Ctr.*, 47,295, p. 8 (La.App. 2 Cir. 6/20/12), 93 So.3d 855, 860 (citing *Smith*, 639 So.2d 730). To satisfy the good faith requirement, the one making the statement must have reasonable grounds to believe it to be true. *Id.*

As noted by the supreme court, "the public has an interest in possible criminal activity being brought to the attention of the proper authorities, and have extended a qualified privilege to remarks made in good faith." *Kennedy*, 935 So.2d at 683.

> The public policy reasons supporting the extension of such a privilege are succinctly stated in *Arellano v. Henley*, 357 So.2d 846, 849 (La.App. 4 Cir.1978):
>
> > It would be self-defeating for society to impose civil liability on a citizen for inaccurately reporting criminal conduct with no intent to mislead. If the risks to the citizen are too high, a fertile field for criminal suppression will have disappeared.
>
> In other words, the qualified or conditional privilege extended to the communication of alleged wrongful acts to the officials authorized to protect the public from such acts is founded on a strong public policy consideration: vital to our system of justice is that there be the ability to communicate to police officers the alleged wrongful acts of others without fear of civil action for honest mistakes.

*Id.*

Colonel Oliphant introduced the following exhibits in support of his motion for summary judgment: Mr. Braxton's original and second supplemental and amending petitions; his answer and affirmative defenses to both petitions; excerpts from his deposition; excerpts from the depositions of Craig Brown, Mike Wilson, Thurman Miller, Mr. Braxton, and Donald Rachal; and his affidavit, with the attached March 2, 2018 Incident Report.

In his second supplemental and amending petition, Mr. Braxton alleged the following in regard to the March 2, 2018 Incident Report:

> **During the deposition of defendant Oliphant on June 26, 2019, Petitioner learned, for the first time, that defendant Oliphant authored a publication dated March 2, 2018, in which defendant Oliphant falsely accused Petitioner of murder. Defendant Oliphant published said document and his false accusation that Petitioner had committed a homicide decades earlier in Shreveport, Louisiana, to defendant State Police, through Superintendent Reeves and Major Noel, among many others. In addition, defendant Oliphant and defendant State Police caused the contents of the March 2, 2018, document [sic] and the false accusation that Petitioner committed a homicide to individuals in Shreveport, Louisiana, the former husband of the deceased, and others. Defendants Oliphant and State Police have continued to repeat and publish the false allegations that Petition committed a homicide since the June 26, 2019, deposition [sic] of Oliphant. Petitioner shows these statements are false, defamatory, defamatory per se, were published with actual malice, and have been republished throughout the State of Louisiana by defendant Oliphant and State Police, for which they are liable and for which Petitioner sues for herein.**

Included in the fourteen affirmative defenses specifically pled by Colonel Oliphant in his answer was the affirmative defense of conditional or qualified privilege.

In his January 20, 2022 affidavit, Colonel Oliphant stated that "[o]n March 2, 2018, I prepared and filed with the proper Louisiana State Police channels a <u>Department of Public Safety & Corrections Incident Report</u>, a true and correct copy of which two-page document is attached hereto." The March 2, 2018 Incident

15

Report, which is addressed to Lieutenant Colonel David Staton of LSP, describes the nature of the incident at issue as "Public Intimidation by Calvin Braxton/Officer Safety Concern[.]" The report, in its entirety, states:

On or about the morning of Wednesday, February 21, 2018 at approximately 0610 hrs., I left my residence located at 1241 Hwy 504, Natchitoches, La. 71457, enroute to Zachary, LA. The purpose for my trip was to attend a Strategic Highway Safety Plan meeting at the Louisiana State Police, Joint Emergency Services Training Center's (JESTC) Staff Development Center (SDC). At the conclusion of the meeting, I returned to Natchitoches, LA. and arrived at my residence at approximately 1525 hrs., which is also about the same time my 15-year-old son gets off the school bus to come home from school. As I turned off LA 504 into my private driveway, I noticed a small, silver Ford hatchback/wagon-type vehicle parked on Jamar Dr., which is located about 250-300 yards east of my residence, and is the main entrance to the subdivision in which my home is located. The vehicle looked very suspicious, and was "out of place" as it sat near a wooded lot. *It should be noted that during the previous week; I had received two telephone calls from fairly credible and reliable individuals, who advised me that Mr. Calvin Braxton has hired the services of a private investigation firm or "somebody" to watch and follow me. Mr. Braxton is a former LSP Commission Member, and current owner of the Natchitoches Ford dealership, which is located on LA 1 Bypass, in Natchitoches, LA.* I immediately stopped in my driveway and backed up, entering LA 504. As I proceeded eastbound on LA 504, I made [sic] right turn onto Jamar Dr., where the vehicle was parked, and immediately observed a "Natchitoches Ford" license plate on the front of the vehicle, which is not necessarily uncommon. As I approached the vehicle, it accelerated and fled the scene eastbound on LA 504 towards LA 3191, in a very rapid and suspicious manner. I quickly turned around and followed the vehicle, with two vehicles between us. There was inclement weather (rain), which left water on the roadway, thus preventing me from affecting a traffic stop in a safe manner. There also aren't any improved shoulders on this stretch of highway. I continued following the vehicle until it reached the intersection of LA 3191, where it pulled over and came to a stop. I contacted Region 3 Dispatch and requested an inquiry regarding the license plate, LA# ZPU671, which was displayed on the rear of the vehicle. I proceeded southbound on LA 3191, due to the inclement weather, and did not conduct a traffic stop on the vehicle and its driver. I made a U-turn and drove back to my residence. The vehicle was registered to Erin Haley Friedman and Gregory Friedman, 256 Plantation Point, Natchitoches, LA. The name Friedman is well-known in Natchitoches, LA., and is alleged to have business connections with Mr. Braxton; specifically Samuel James Friedman a.k.a. Sam James, who is the father of Gregory Friedman.

To somewhat confirm someone is watching my/our every move has caused great concern for my safety and the safety of my family. I have

16

no idea what Calvin Braxton's intentions are, and I'm not sure what he is capable of specific to harming me or my family. What's even more concerning to me is the mysterious and untimely death of a woman named Lydia Rachal, whom Calvin Braxton was allegedly dating at the time of her death several years ago. Rachal's death, ultimately ruled a suicide, occurred in a hotel located in the Shreveport/Bossier City area. The fact that Calvin Braxton's name was closely connected to this woman at the time of her death is enough reasonable suspicion for me to be concerned for my safety and the safety of my family. It would be my suggestion that Louisiana State Police review the case file regarding the death of Lydia Rachal to determine the actual manner of death and/or determine if there was any possibility of foul play. Additionally, I'm requesting the Louisiana State Police conduct a personal threat assessment regarding the capabilities of Calvin Braxton, Gregory Friedman and Erin Friedman to potentially harm me or my family. I was so concerned that I contacted the Louisiana State Police/Troop E, and requested that they make frequent security checks around my residence. I've also advised LSP/E to contact the Natchitoches Parish Sheriff's Office to conduct the security checks as well.

For months, I have noticed several suspicious-looking vehicles as I travel the highways of the State of Louisiana, and have even conducted counter-surveillance missions to see if someone is following me. I'll occasionally travel to open parking lots (department stores, malls, business districts) and just park, to observe the movements of other vehicles. I have even exited my vehicle and walked in certain areas to see if I can identify suspicious vehicles. As a Louisiana State Trooper, I will remain vigilant and do my best to ensure that I provide a safe environment for me and my family.

Colonel Oliphant testified that following the February 21, 2018 incident with the suspicious vehicle, he filed the March 2, 2018 Incident Report in which he reported the possibility that Mr. Braxton had hired a private investigator to follow or watch him. He based this claim on information he had received from Mr. Brown and Mr. Wilson, both of whom he described as being fairly credible and reliable. Colonel Oliphant testified Mr. Brown called him a week prior to the February 21, 2018 incident and told him that Mr. Braxton had someone, possibly a private investigator, following him.

Colonel Oliphant testified that Mr. Wilson, a long-time friend, also contacted him prior to the February 21, 2018 incident, and informed him that Mr. Braxton was on a fishing expedition to gather information on him. Colonel Oliphant stated that

17

Mr. Wilson warned him that Mr. Braxton was a dangerous man and related his suspicions concerning the 1991 death of Lydia Rachal, who was allegedly involved with Mr. Braxton at the time of her death. Colonel Oliphant testified that Mr. Wilson, who had attended Ms. Rachal's autopsy, felt that something was not right with the investigation into her death. Colonel Oliphant stated that based on this conversation, he considered Mr. Braxton to be dangerous as he was not sure what he was capable of doing.

Colonel Oliphant testified that he was later contacted by Ms. Rachal's ex-husband, Donald Rachal, in late 2018 or early 2019, who told him that he personally had a problem with Mr. Braxton as he believed that Mr. Braxton was having an affair with Ms. Rachal at the time of her death. Colonel Oliphant said that he was told by Mr. Rachal that he probably needed to be careful.

Mr. Brown, a friend of both Mr. Braxton and Colonel Oliphant, confirmed his conversation with Colonel Oliphant, stating that he told Colonel Oliphant, "'I heard that someone said Mr. Braxton had somebody out there watching you, watching your house, investigating you.'" He further testified that he later asked Mr. Braxton if this was true, to which Mr. Braxton replied, "'Well, I don't know anything about it.'" He further replied, "'I'm not aware. I've never heard. This is my first time hearing it.'" However, Mr. Brown could not recall if he ever relayed Mr. Braxton's denial to Colonel Oliphant.

Mr. Wilson, a former deputy with the Natchitoches Parish Sheriff's Office (NPSO), testified that he learned from Mr. Brown that Mr. Braxton had possibly hired someone to watch Colonel Oliphant. He stated that when he spoke to Colonel Oliphant about the rumor, he stated, "if that was the case, you know, I told him I didn't – I didn't condone that, friend or not, and that was real dangerous." When asked if he told "Colonel Oliphant to be careful because Calvin Braxton is a

18

dangerous man[,]" he replied, "I told [Colonel] Oliphant to be careful. And there again, not for any physical reasons but for the matter what we're dealing with today, you know. Reputations and careers and all that, you know, plays into all of this." When asked, "But when you told Mr. Oliphant to be careful, you meant for him to be careful[,]" Mr. Wilson replied, "Exactly. Especially after I found out supposedly someone was watching him and near his home." He further admitted that he might have told Colonel Oliphant that Mr. Braxton was on a fishing expedition to gather information on him and that he should watch his back.

Mr. Wilson also admitted that he discussed Ms. Rachal's death with Colonel Oliphant "when everything was coming up[.]" He admitted that he had had concerns about the cause of Ms. Rachal's death based on the fact that her body was not discovered by the hotel room service until one or two days following her death and based on his knowledge of her love for her family. He was aware of rumors that Mr. Braxton was involved with Ms. Rachal at the time of her death, but when asked if he thought Mr. Braxton was involved in her death, he stated, "Hands on, no, ma'am. Never did. I knew that there were [sic] reportedly a relationship between the two. Physically, no, ma'am. Morally, you know, there again, those were rumors that was discussed around town." Mr. Wilson further recounted that when he spoke to Mr. Rachal about his deceased ex-wife, Mr. Rachal acknowledged that he had spoken to Colonel Oliphant, but that he wanted to leave the issue "completely alone because he didn't want to stir it back up and hurt his children anymore."

Thurman Miller, a Trooper First Class, Senior Trooper, and Master Trooper with LSP, testified that Mr. Braxton spoke to him about Trooper Linebaugh at one point and advised him "that Linebaugh needed some remedial training and he needed to learn professional – professional courtesy." He stated that he reported this conversation to Colonel Oliphant. Trooper Miller stated that "Mr. Braxton was

19

suggesting that he sits on the commission; Linebaugh needs to know that he sits on the commission when it comes to Louisiana State Police, and that's where the professional courtesy comes in at." He also reported to Colonel Oliphant that Mr. Braxton had told him that Linebaugh needed to be transferred to New Orleans for remedial training.

Mr. Rachal, a deputy with the NPSO and formerly with the Northwestern State University Police Department, testified that he spoke to Colonel Oliphant, a long-time friend, about his former wife's death and her relationship with Mr. Braxton. When asked if he warned Colonel Oliphant about Mr. Braxton, he stated, "I told him I didn't trust him. I didn't trust – I don't trust him at all[,]" and that he needed to be careful regarding Mr. Braxton "[b]ecause he's unpredictable."

As a trooper with LSP, Colonel Oliphant has an interest in the subject matter of the contents of the report, as they involved him in his position of employment. Therein, he reported to his superiors that he perceived that he was being followed and/or surveilled because of his position and because of his involvement with Mr. Braxton. Colonel Oliphant based this claim on credible information relayed to him by his friends. LSP had been involved with Mr. Braxton's claims as well at that point and certainly would have wanted or needed to know this information. Indeed, Colonel Oliphant arguably had a duty as a trooper to report the suspected activity. As his employer, and as an investigatory agency, it was in the purview of LSP to determine whether Colonel Oliphant was justified in his concerns. As we held in our prior opinion, "We agree that Mr. Braxton cannot establish that there was an unprivileged communication to a third person. Once the State Police received Colonel Oliphant's March 2018 Incident Report, it was obligated to investigate, which it did." *Braxton*, 333 So.3d at 529.

Considering the forgoing evidence, we conclude that Colonel Oliphant's statements in the March 2, 2018 Incident Report were made in good faith, on a subject that he had an interest or duty to communicate on, and that they were made to Lieutenant Colonel Staton, a person having a corresponding interest or duty. Thus, his statements were protected by qualified privilege. The burden now shifts to Mr. Braxton to prove that Colonel Oliphant abused that privilege by acting with malice or a lack of good faith when publishing his statements.

> A privilege is abused if the publisher (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity.

> Mere negligence as to the falsity (or lack of reasonable grounds for believing the statement to be true) is not sufficient to prove abuse of the conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose. Failure to investigate does not present a jury question on whether a statement was published with reckless disregard for the truth. Under this standard, even proof of gross negligence in the publication of a false statement is insufficient to prove reckless disregard.

> In considering the definition of "reckless disregard," . . . noted that the Supreme Court has explained that only those false statements made with a high degree of awareness of their probable falsity meet the reckless disregard standard, citing . . . . The Supreme Court stated that reckless disregard requires a plaintiff to prove that the publication was deliberately falsified, or published despite the publisher's awareness of probable falsity. The Supreme Court has noted that there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*Hakim v. O'Donnell*, 49,140, pp. 14-15 (La. App. 2 Cir. 6/25/14), 144 So.3d 1179, 1189 (Internal citations omitted).

In deciding whether an abuse of the privilege has been established, the Supreme Court in *Smith* noted that "[a]nother definitional approach is to avoid altogether attempting to define the overused term 'malice.' " *Smith*, 93-2512, p. 24, 639 So.2d at 749. Under this alternative approach, "the conditional privilege is abused 'if [the actor] does not act for the purpose of protecting the interest for the

21

protection of which the privilege is given.' " *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 603).

*Alexander v. Blue Williams L.L.P.*, 18-776, pp. 17-18 (La.App. 4 Cir. 1/23/19), 363 So.3d 272, 285, *writs denied*, 19-432, 19-435, 19-431 (La. 9/6/19), 278 So.3d 370, 372, 968.

Mr. Braxton introduced the following exhibits into evidence in opposition to Colonel Oliphant's motion for summary judgment: excerpts from the depositions of Colonel Oliphant, Trooper Jay O'Quinn, Mr. Braxton, Mr. Wilson, Mr. Brown, Mr. Rachal, Trooper T.J. Doss, Trooper Linebaugh, and Trooper Miller; Mr. Braxton's affidavit; and Mr. Braxton's responses to Colonel Oliphant's interrogatories and requests for production of documents.

After reviewing Mr. Braxton's evidence, we find that nothing contained therein establishes that Colonel Oliphant knew that the statements contained in his March 2, 2018 Incident Report were false or that he entertained serious doubt as to the truthfulness of those statements. Rather, the evidence establishes that Colonel Oliphant's statements were based on conversations he had with Mr. Brown, Mr. Wilson, and Mr. Rachal regarding Mr. Braxton's possible actions and the incident with the suspicious vehicle, which he knew was licensed to the son of Mr. Braxton's business partner.

The evidence further established that Mr. Doss contacted Colonel Oliphant after hearing that Mr. Braxton was having him followed and was "potentially shopping a story about [Colonel] Oliphant to the media." Trooper Linebaugh testified that he saw a suspicious vehicle parked near Colonel Oliphant's house one day and that a vehicle drove slowly past his house one day, with someone in the back seat taking his picture. He stated that while he was not afraid of Mr. Braxton, he was afraid of what he could do to his career. He had further heard from various NPSO deputies that Mr. Braxton wanted to have him kicked out of Natchitoches Parish.

Trooper Thurman testified regarding the close relationship between the Braxton and Friedman families. He stated that after Colonel Oliphant determined that Erin Friedman was following him, he (Trooper Thurman) was told by a police officer with a private investigator license that Erin had contacted him about using his license. He stated that the officer "didn't feel like something was right, so he didn't – he didn't allow her to use his license."

As the only conclusion that can be drawn from Mr. Braxton's evidence is that Colonel Oliphant did not abuse the qualified privilege, we find that his statements of any alleged suspect activity by Mr. Braxton were protected.[3] Accordingly, the judgment of the trial court granting summary judgment in favor of Colonel Oliphant on the issue of the March 2, 2018 Incident Report is affirmed.

## DECREE

For the foregoing reasons, the judgment of the trial court awarding the State of Louisiana, Department of Public Safety and Corrections (Office of LSP), $50,376.25 in attorney fees for its successful La.Code Civ.P. art. 971 Special Motion to Strike is affirmed. The judgment of the trial court granting summary judgment in favor of Colonel Jay Oliphant on the issue of his March 2, 2018 Incident Report is further affirmed. The costs of this appeal are assessed to Calvin W. Braxton, Sr.

**AFFIRMED.**

---

[3] Having found that there was no actual malice in Colonel Oliphant's statements and that they were made in good faith, such as to invoke a qualified privilege, we need not address Mr. Braxton's arguments of defamatory per se, as this presumption is rebuttable. *Bass v. DISA Global Sols., Inc.*, 20-71 (La.App. 1 Cir. 12/30/20), 318 So.3d 923, *writ denied*, 21-147 (La. 3/23/21), 313 So.3d 273.